

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

NIGHT BOX
FILED

OCT 15 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

**CASE NO. 01-CIV-0156-MARTINEZ/DUBE**

IN RE HAMILTON BANCORP, INC.     )
SECURITIES LITIGATION     )
    )
    )

## DEFENDANT DELOITTE & TOUCHE LLP'S MEMORANDUM
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

This memorandum is submitted by defendant Deloitte & Touche LLP ("Deloitte") in opposition to plaintiffs' motion to certify the proposed class and to appoint the remaining three lead plaintiffs as class representatives.[1]

### INTRODUCTION

In their motion for class certification, plaintiffs lump together all of their claims against all three groups of defendants — the Hamilton defendants, Deloitte, and the underwriters of certain Hamilton Trust Preferred Securities — and seek certification of a single class consisting of all persons who purchased or otherwise acquired Hamilton Bancorp securities between April 21, 1998 and June 8, 2001. As demonstrated in Part I below, the proposed class is clearly much broader than the claims plaintiffs have asserted against Deloitte. At most, a class against Deloitte would consist of purchasers of common stock during the period from March 31, 1999 (when Deloitte issued the first audit opinion at issue here) through May 16, 2001 (when Hamilton disclosed that it would be restating its 1999 financial statements).

---

[1]     Plaintiffs' counsel previously withdrew two other lead plaintiffs who had been appointed by the Court, Robert and Gunilla Lieberman, after learning that they were "not involved in making any investment decisions" relating to Hamilton. *See* June 5, 2002 e-mail from Jack Riese (copy attached hereto as Exhibit A).



Only two of the remaining lead plaintiffs (James Winn and John Albers) are members of the putative "Deloitte" class described above. As demonstrated in Part II below, both of them are subject to unique defenses, which make them inadequate representatives of the proposed class. Both Mr. Winn and Dr. Albers bought their Hamilton stock through the same investment adviser (Charles Roth), who had "carte blanche" to decide what securities to buy and sell in their accounts.   Mr. Roth was a market-maker in Hamilton stock, who over a two-year period purchased approximately 300,000 shares of Hamilton stock on behalf of himself and a number of clients, including Mr. Winn and Dr. Albers.   The deposition testimony shows that by March 2000, Mr. Roth started having misgivings about the Bank.   By November 2000, Mr. Roth's concerns had risen to the point where he believed that Hamilton's management was "incompetent," that Hamilton's Chairman and CEO (Eduardo Masferer) was "the Joey Buttafuco of the banking business," and that Hamilton's shareholders were in a "perilous" situation with a "thin market" for Hamilton stock.   Indeed, Dr. Albers testified that Mr. Roth told him that he had come to believe by the end of 2000 that the Bank was run by a bunch of "crooks."   Nevertheless, despite these misgivings, Mr. Roth continued to buy thousands of shares of Hamilton stock for both Dr. Albers and Mr. Winn's accounts   — purchases for which plaintiffs now seek to hold Deloitte liable.

In order to recover against Deloitte under Section 10(b) of the Securities Exchange Act of 1934, plaintiffs would have to persuade the finder of fact that Deloitte made a false statement or omission of material fact with scienter "upon which the plaintiff justifiably relied . . . that proximately caused the plaintiff's injury."   *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997).   The elements of reliance and proximate causation require plaintiffs to prove (among other things) that the "misrepresentations and omissions" for which they seek to

2

hold the particular defendant liable "cause[d] the plaintiff 'to engage in the transaction in question.'"  *Id.*  In this case, the deposition testimony makes it clear that Deloitte has reliance and causation defenses against Messrs. Albers and Winn  that are unique to them (and perhaps to other clients of Mr. Roth's) that will focus on what Mr.  Roth knew and believed and why he chose to purchase Hamilton stock for their accounts.

At this point, the full extent of Deloitte's reliance/causation defense against Messrs. Albers and Winn is not yet known because Deloitte has been unable to complete its class discovery.  Deloitte subpoenaed information from Mr. Roth and his firm about his other clients for whom he bought and sold Hamilton stock in order to determine whether Mr. Roth was buying Hamilton stock for Messrs. Winn and Albers *from his other clients*.  If Roth was buying Hamilton stock for Winn and Albers, despite a belief that Hamilton was run by "crooks," in order to serve his own or his other clients' financial interests, then Deloitte would be able to offer even more evidence to show that there was no reliance or transaction causation in their particular situations.  Accordingly, if the Court is not persuaded, based on the discovery record to date, that Albers and Winn would be atypical and inadequate class representatives, Deloitte respectfully submits that it would make sense for the Court to postpone consideration of the motion for class certification until it has ruled on Deloitte's objections to the magistrate's discovery ruling and (if the ruling is reversed) Deloitte has completed the additional discovery it seeks.

Finally, Mr. Roth's testimony shows that this is a case where individual issues of reliance and causation are likely to predominate over any common issues.  Plaintiffs have invoked the "fraud-on-the-market" presumption in order to avoid the necessity of proving reliance on an individualized basis. But in this case the foundation for applying the fraud-on-the-market theory — the purported efficiency of the market for Hamilton stock — is questionable at best.

3

Moreover, Mr. Roth's testimony suggests that he and other money managers who purchased Hamilton stock for their clients were becoming increasingly disillusioned with the bank's management during the purported class period, raising the question of what information they were — and were not — relying upon in continuing to purchase the stock. The only way to determine whether purchasers were in fact relying on Deloitte's audit opinions in deciding to buy Hamilton stock would be to conduct an individual inquiry into the facts surrounding each purchase — an enterprise that is fundamentally at odds with the concept of a class action.

## BACKGROUND

Hamilton Bancorp, Inc. was the parent company of a national bank headquartered in Miami, which specialized in global trade finance in Latin America and the Carribean. Complt. ¶ 3. Throughout the period at issue in the complaint, Deloitte was Hamilton's independent auditor. *Id.* ¶ 8. In October 2001, Deloitte resigned as Hamilton's auditor and in January 2002, the Bank was closed by the Office of the Comptroller of the Currency ("OCC").

This lawsuit was filed in January 2001 on behalf of a purported class of investors who had purchased Hamilton stock, which was traded on the NASDAQ. Originally, only Hamilton and four of its officers and directors were named as defendants. On June 22, 2001, however, after Deloitte issued a "going concern" opinion expressing doubt about Hamilton's ability to survive, plaintiffs amended their complaint to add Deloitte in the transparent hope of finding a deep pocket to pay for their investment losses.

Plaintiffs' complaint against the Hamilton defendants is based on a broad array of alleged misstatements about the Bank's past and likely future performance that were made in SEC filings, press reports and press releases from April 21, 1998 through the end of the purported class period in June 2001. By contrast, plaintiffs' complaint against Deloitte is limited to two discrete accounting issues, one involving Hamilton's 1998 and 1999 financial statements and the

4

other involving only its 1999 financial statements, which subsequently led to restatements of those financial statements in December 2000 and June 2001.

### The 1998 Russian Loan Issue

The first accounting issue raised by the complaint involves the question of how the 1998 sale of certain Russian loans held by Hamilton Bank and its purchase of certain Latin American securities should have been booked.  It is undisputed that in its 1998 year-end financial statements, Hamilton accounted for these purchases and sales as entirely separate and independent transactions, booking them based on the purchase and sales prices that were paid or received.  Documents produced in this litigation show that throughout the relevant period, the Bank represented to Deloitte (and the Bank's regulators) that the transactions were, in fact, unrelated.  *See, e.g.*, 11/15/00 Report by Greenberg Traurig LLP to Hamilton Audit Committee (attached hereto as Exhibit B).  During the course of its 1998 audit work, Deloitte never saw any documents that indicated otherwise.  Accordingly, when Deloitte issued its audit opinion with respect to the Bank's 1998 financial statements on March 31, 1999, it had no reason to believe that those financial statements contained any material misstatements.

The evidence will show that more than a year after Deloitte issued its audit opinion, in July 2000, the OCC brought certain documents to Deloitte's attention that it had obtained from New York bank regulators.  Those documents suggested that Hamilton's 1998 sale of Russian loans and purchase of Latin American securities might have constituted a "swap" of assets, rather than independent purchases and sales, as the Bank had represented them to be.  If the transactions constituted a "swap," generally accepted accounting principles ("GAAP") would have required the assets to be recorded at their fair values, rather than at the prices received and paid, as the Bank had done.  Upon learning this information, Deloitte asked the Bank to retain

outside counsel to investigate whether a "swap" had, in fact, occurred, and whether Bank management had intentionally misrepresented facts to Deloitte. *See* Exhibit B hereto.

The Bank retained the law firm of Greenberg Traurig LLP ("Greenberg") to conduct an investigation. Although the reports issued by Greenberg ultimately concluded that there had not been a "swap" and that Bank management had not lied to Deloitte, Deloitte still concluded that the Bank should restate its financial statements to reflect "swap accounting" treatment for these transactions.

Hamilton announced the restatement on December 22, 2000. In its originally-filed 1999 financial statements (which were issued on April 4, 2000), the Latin American securities the Bank had purchased had already been written down to their market value. The restatement shifted the write-down of those securities from 1999 back into 1998. Thus, Hamilton restated its 1998 financial statements to decrease its 1998 after-tax income by $14.3 million, while at the same time making a corresponding increase of $14.3 million in comprehensive income for 1999. Complt. ¶ 210. Because the changes offset each other, there was no change in shareholders' equity as of December 31, 1999. *Id.*

There was no appreciable market reaction to the December 22, 2000 announcement. In fact, there was no change in the market price of Hamilton stock on the first trading day (December 26) after that announcement and the market price of Hamilton stock actually rose on the following day (December 27).

*The 1999 ATRR Issue*

On February 2, 2000, before it filed its 1999 10-K and its audited financial statements for 1999, Hamilton issued a press release in which it disclosed, among other things, that at the direction of bank regulators the Bank had taken "for regulatory reporting purposes only" a "transfer risk reserve of $32 million related to the Bank's exposure in Ecuador." Complt. ¶ 151.

"Transfer risk" is the risk that a particular country will have insufficient foreign exchange available to service its citizens' external debt, thus making it impossible for even solvent debtors to discharge their obligations. Complt. ¶ 100.  For each country exposure that the Interagency Country Exposure Review Committee ("ICERC") rates "value impaired," the ICERC recommends a percentage level for the ATRR. *Id.* ¶ 105.  That percentage is then applied to any loan from a borrower located in the country in question that is either in default or has been restructured to avoid default. *Id.* ¶ 213.

In 1999, the ATRR for Ecuadoran credit exposure fixed by the ICERC was 90%. Complt. ¶ 213.   The OCC considered $36 million or approximately half of Hamilton's outstanding Ecuadoran exposure to be restructured debt, and took the position that Hamilton was required, at least for regulatory reporting purposes, to take a 90% reserve against that exposure in its 1999 filings — notwithstanding (as the Company later explained) "that 99% of the Bank's assets related to this reserve are performing assets." *Id.* ¶¶ 151, 202, 239.

In its 1999 10-K, issued on April 14, 2000, Hamilton explained the different accounting methods more fully, stating that the OCC had directed it to take $32 million in transfer risk reserves related to its exposure in Ecuador.  Complt. ¶¶ 152, 294.  Hamilton stated that it had followed the OCC's directives for regulatory accounting purposes only — and *not* for GAAP accounting purposes — and that, even for regulatory accounting purposes, it "disagree[d] with the OCC's interpretations . . . and is appealing such directions within the OCC." *Id.* ¶ 294. Thus, readers of Hamilton's 1999 audited financial statements were advised that the Bank's GAAP reserves were $32 million lower than the reserves reported for regulatory purposes.

In October 2000, Hamilton announced that it had settled its administrative appeal and would no longer contest the changes the OCC had directed it to make for regulatory accounting

7

purposes or the higher capital requirements necessitated by those changes. Complt. ¶ 199. However, Hamilton issued a press release once again advising investors that it was *not* changing its GAAP financial statements to make them consistent with its regulatory accounting. *Id*. ¶ 202.

Under GAAP, a reserve for an asset can only be established if it is probable that a loss has already been incurred and the loss can reasonably be estimated. *See* Statement of Financial Accounting Standard ("FAS") Nos. 5, 114. Neither the Bank nor Deloitte believed that a 90% reserve could be justified under FAS 5 and FAS 114 with respect to the Ecuadoran loans. Among other things, Deloitte relied upon the fact that Hamilton had purchased insurance to cover any currency transfer risk and had obtained an opinion from counsel that the insurance applied to the Ecuadoran exposure covered by the ATRR reserve. As a result of these and other factors, Deloitte made a judgment that it was appropriate to issue an unqualified audit opinion with respect to Hamilton's 1999 financial statements even though those financial statements did not include the ATRR in Hamilton's GAAP reserves. The financial statements themselves did, however, fully disclose that the 90% ATRR had been included in the Bank's regulatory filings and that there was therefore a $32 million difference between the Bank's GAAP and statutory financial statements.

In early 2001, more than nine months after Deloitte issued its audit opinion with respect to Hamilton's 1999 financial statements, the SEC challenged Hamilton's treatment of the ATRR reserve in its GAAP financial statements. Throughout early 2001, there were ongoing discussions between the Company and the SEC Staff, which delayed the filing of the Company's 2000 10-K. Complt. ¶ 236. Finally, on May 16, 2001, the Company chose to avoid further delays by restating its 1999 financial statements for the second time to include a $32.7 million ATRR provision for its Ecuadoran exposure. The market, which had known about the ATRR

dispute for more than a year, once again did not show any appreciable reaction to the news of the restatement.

*Plaintiffs' Allegations*

Plaintiffs allege that in 1998 the Hamilton defendants sold the Russian loans and bought the Latin American securities at inflated prices in order to avoid writing down the Russian loans and to record a phony profit. Plaintiffs do not contend that Deloitte was a participant in this alleged deception. Instead, they claim that Deloitte acted recklessly during the course of its audit by supposedly ignoring unspecified "red flags" that plaintiffs claim must have alerted Deloitte to the fact that the transactions were improperly booked. In order to prove their claims against Deloitte, plaintiffs would have to show that Deloitte acted with such "severe recklessness" that an intent to defraud can be inferred.[2] Plaintiffs would also have to show that they justifiably relied on the alleged misstatements in Deloitte's audit opinion and Hamilton's 1998 financial statements in purchasing their Hamilton stock and that they would not have purchased their stock "but for" Deloitte's alleged misstatement.[3]

---

[2]     The state of mind required to prove liability under Section 10(b) is an "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). The Eleventh Circuit has held that "severe recklessness" will suffice to meet the *Hochfelder* standard. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001). The Court has repeatedly stressed, however, that "severe recklessness" is not merely an exaggerated form of negligence. Rather, it is an "extreme departure from the standards of ordinary care, . . . which presents a danger of misleading . . . which is either known to the defendant or is so obvious that the actor must have been aware of it." *Id. See also Searls v. Glasser*, 64 F.3d 1061, 1065 (7th Cir. 1995) (applying the same test and holding that the *Hochfelder* standard requires proof that "the deceit was committed with the intent to mislead or at least with recklessness so severe that it is the functional equivalent of intent"); *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (in the context of outside auditors, recklessness must "approximate an actual intent to aid in the fraud being perpetrated by the audited company").

[3]     In *Robbins v. Koger Properties, Inc.*, 116 F.3d at 1447, the Eleventh Circuit explained that, in order to prove the necessary element of proximate causation, plaintiff must be able to show both transaction causation and loss causation. The Court further explained that "transaction causation"
(cont'd)

With respect to the 1999 ATRR issue, plaintiffs have a different theory. There is no dispute about Deloitte's knowledge of the ATRR issue: the fact that the OCC had required Hamilton to take a $32 million ATRR reserve for regulatory accounting purposes was disclosed in the footnotes to Hamilton's financial statements. Plaintiffs contend that Deloitte's position with respect to the proper GAAP accounting treatment of an OCC-mandated ATRR reserve was wrong. In their complaint, plaintiffs cited a 1984 SEC Staff Accounting Bulletin which they claimed made it clear that GAAP required such an ATRR reserve to be taken for GAAP accounting purposes as well, regardless of whether such reserve would have been appropriate under GAAP absent the ATRR. Plaintiffs argue that Deloitte's position was so far beyond the pale of reasonable judgment by an auditor that Deloitte should be deemed to have issued its audit opinion with an intent to defraud.[4]

In order to prevail on their ATRR claim, plaintiffs would have to prove not only that Deloitte acted with an intent to deceive in issuing its audit opinion, but also that plaintiffs were

---

(... cont'd)

"is akin to actual or 'but for' causation" — that is, but for the misstatement, the purchase would not have been made. "Loss causation," on the other hand, "require[s] proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." *Id.* at 1441. In this case, where the market did not react when Hamilton's 1998 financial statements were restated, it is hard to see how plaintiffs can hope to be able to prove the necessary element of loss causation.

[4]     At the time the Staff Accounting Bulletin was issued, ATRR's were generally at about the 10% level; as a result, the Staff treated an ATRR reserve as a minimum and warned registrants that they should consider whether GAAP required more. The Staff did not discuss, nor could it have foreseen, the situation here: where the ATRR had been set at a level (90%) that the registrant believed was far in excess of its actual risk of loss. However, the logic of the Staff Bulletin itself — which requires the registrant to apply GAAP without regard to the ATRR — suggests that in such a case the ATRR reserve should *not* be taken if the reserve is not required by GAAP. *See* Staff Accounting Bulletin No. 56, 1984 WL 50408, *2 (S.E.C. Jan. 31, 1984). In any event, the Bulletin itself warns that Staff interpretations "are not rules or interpretations of the Commission nor are they published as bearing the Commission's official approval." Under these circumstances, a reasonable accountant would not have viewed the Staff Bulletin as the controlling pronouncement on this issue.

deceived.  Since the entire ATRR issue was disclosed in the financial statements themselves, plaintiffs would have to show that it would have made a material difference to investors if Hamilton had recorded the same reserves for GAAP accounting purposes that it recorded for regulatory purposes.  Once again, plaintiffs would have to show not only justifiable reliance on Deloitte's audit opinion, but also that they would not have bought the Hamilton stock purchased after the audit opinion was issued on April 14, 2000 if the ATRR had been added to Hamilton's reserves for GAAP accounting purposes, as well as regulatory accounting purposes.[5]

*The Named Plaintiffs*

Dr. John Albers and James Winn were both clients of Charles Roth, who has been an investment adviser for fifty years.  Both testified that they had given Mr. Roth full discretionary authority to buy and sell stock for their respective accounts.  *See* Roth Dep. Tr. at 8; Albers Dep. Tr. at 29-30, 42,46; Winn Dep. Tr. at 18, 30-31, 37, 97-98, 150, 166-67.[6]  Both relied completely on Mr. Roth with respect to their purchases and sales of Hamilton stock.  Indeed, neither had even heard of Hamilton Bank before Mr. Roth purchased Hamilton stock for them. Albers at 49; Winn at 57.  Accordingly, for purposes of determining whether plaintiffs have a claim for securities fraud against Deloitte, it is Mr. Roth's state of mind that is critical. *See, e.g., Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 190 (3d Cir. 2001); *Williams v. Balcor Pension Investors*, 150 F.R.D. 109, 114 (N.D. Ill. 1993); *Markewich v. Ersek*, 98 F.R.D. 9, 11 (S.D. N.Y. 1982).

---

[5]     In order to establish loss causation, plaintiffs would also have to show that losses in Hamilton's Ecuadoran portfolio, which were supposedly concealed by the failure to take an ATRR reserve in 1999, ultimately caused a loss in the value of their Hamilton stock.

[6]     Copies of the deposition testimony of Roth, Albers and Winn cited herein are attached as Exhibits C, D and E, respectively.

Mr. Roth was introduced to Hamilton when he attended a presentation by Juan Carlos Bernace (Hamilton's Executive Vice President) at a June 1999 bank conference. Impressed by what he personally saw and heard, Roth thereafter began purchasing some 300,000 Hamilton shares on behalf of approximately one to two dozen clients, including Albers and Winn. Roth at 19. Roth and his firm, Montag & Joselson, also purchased at least some Hamilton stock for their own account. Roth at 16-17. Roth and all of his clients who purchased Hamilton stock are therefore potential class members in this action.

Roth testified that he became skeptical about Hamilton's prospects during the March 2000 time frame, eight or nine months after first buying Hamilton stock. Roth at 47. By November 2000 — seven months before the end of the proposed Class Period — Roth's skepticism had risen to the point where he felt compelled to write a letter to Hamilton's Chairman, Eduardo Masferrer, complaining about Hamilton's deteriorating prospects and expressing his view that:

Hamilton's shareholders were "in a perilous situation with virtually no hope for an early recovery."

- The earnings projections on which he had relied to acquire Hamilton's shares had been "derailed" in 1999 and then "completely wrecked" in 2000.

- "Recent disclosures of a laxity in underwriting and risk selection have eroded the stature Hamilton Bancorp once enjoyed."

- Hamilton's shareholders were "corralled in a thin market with fragile bids and virtually no resistance to decline, the precursor of a growing malaise."

Nov. 10, 2000 Letter from Roth to Masferrer (copy attached hereto as Exhibit F).

At his deposition, Roth confirmed that by December 2000, he believed Hamilton's condition was not only "perilous," but that its management was "incompetent," and that its

12

president, Masferrer, was, as Roth colorfully put it, "the Joey Buttafuco of the banking business." Roth at 87.  By February 2001, Roth's confidence in Hamilton had sunk to the point where he "thought Hamilton management had all the savoir faire of a hemorrhoid." Roth at 118-19.  Albers testified that, after the price of Hamilton stock dropped in late 2000, Roth told him that Hamilton's management "were crooks." Albers at 70.[7]  Nevertheless, Roth, exercising his discretionary authority, continued to purchase thousands of Hamilton shares for Winn and Albers during the next seven months.  Indeed, Roth even purchased 15,000 Hamilton shares for Winn *after* Deloitte issued a "going concern" opinion on June 8, 2001 warning that Hamilton might not survive.  *See* Winn at 131-32; Winn Dep. Ex.14 at 000001. When Winn was asked why he purchased additional shares after Deloitte's "going concern" warning, he replied, "Charlie [Roth] could tell you, I don't know." Winn at 166.

Significantly, at the very time that Roth was purchasing stock for Albers and Winn, he was serving as a "market maker" in Hamilton stock — *i.e.*, putting together purchasers and sellers of the stock and earning a spread on the transaction.  Those transactions included his other clients, his firm's account, and apparently even his own personal account. Roth at 16-17, 19.  As described above, Deloitte has sought discovery into those other transactions in order to determine whether Roth was moving stock among his clients — buying from one client in order to sell to another — providing him with a motive to buy that had nothing whatsoever to do with any of public disclosures by Hamilton or Deloitte.  To date, however, Roth and his firm have refused to produce the requested discovery; the Magistrate denied Deloitte's motion to compel, without any explanation.  Deloitte has filed an appeal from that decision with this Court.

---

[7]    Roth denied having made this statement — or at least having any recollection of making such a statement. Roth at 57-60.  For purposes of this motion, however, the point is that there is a question of fact with respect to why Roth was buying stock for Winn and Albers, which subjects them to a unique defense of lack of reliance or transaction causation.

## ARGUMENT

### I.    Plaintiffs' Proposed Class Is Overbroad With Respect To Deloitte.

Plaintiffs have asked the Court to ignore the differences among the claims they have made against the various defendants and to certify a single class with respect to *all* claims, consisting of anyone who purchased or "otherwise acquired" Hamilton securities, including Hamilton Trust Preferred Securities, between April 21, 1998 and June 8, 2001. It is well settled, however, that class certification "must be addressed on a claim-by-claim basis." *James v. City of Dallas*, 254 F.3d 551, 562 (5th Cir. 2002); *Bertulli v. Independent Ass'n of Continental Pilots*, 242 F.3d 290, 295 (5th Cir. 2001) ("A class should be certified on a claim-by-claim basis"); *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 976 (5th Cir. 2000) ("a court should certify a class on a claim-by-claim basis, treating each claim individually and certifying the class with respect to only those claims for which certification is appropriate"); *Hastings-Murtagh v. Texas Air Corp.*, 119 F.R.D. 450, 455 (S.D. Fla. 1988) (applying same rule in a securities-related class action case). In this case, the proposed class is clearly overbroad with respect to plaintiffs' claims against Deloitte, because it includes many purchasers who do not have any conceivable claim against Deloitte.

The complaint includes both a claim under Section 10(b) against the Hamilton defendants and Deloitte, as well as a claim under Section 11 of the Securities Act of 1933 against the Hamilton defendants and the Underwriter defendants with respect to the December 1998 issuance of the Hamilton Trust Preferred Securities. Plaintiffs have not named Deloitte as a defendant on the Section 11 claim because they do not contend that the registration statement for the Hamilton Trust Preferred Securities included any false or misleading statements by Deloitte.

14

Accordingly, any class that might be certified with respect to the claims against Deloitte cannot include purchasers of the Hamilton Trust Preferred Securities.[8]

The starting and ending dates of plaintiffs' proposed class are also wrong insofar as Deloitte is concerned. In *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1205, 1207 (11th Cir. 2001), the Eleventh Circuit held that an outside auditor like Deloitte cannot be held liable for press releases and other statements made by a company it audits; rather, it can be held responsible under Section 10(b) only for the statements that the auditor itself makes directly to the market or that it knows will be communicated to the market. In this case, the first statement by Deloitte that plaintiffs claim was false or misleading was its audit opinion with respect to Hamilton's 1998 financial statements. That audit opinion was not communicated to the market until March 31, 1999, when Hamilton filed its 1998 10-K with the SEC. Anyone purchasing Hamilton stock before March 31, 1999 could not claim to have relied on any allegedly false statement by Deloitte. Accordingly, any purported class period for claims against Deloitte could not start before March 31, 1999.

Plaintiffs have also suggested too long a class period for their claims against Deloitte. The last restatement at issue here was announced on May 16, 2001. No investor who bought Hamilton stock after the May 16 announcement could have reasonably relied on Deloitte's original audit opinion with respect to Hamilton's 1999 financial statements, when the market *knew* that there would be a restatement. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 181 (3d

---

[8]     The language in the class definition, which sweeps in any person who bought or "otherwise acquired" Hamilton securities is a reference to Section 11, which provides a remedy to "any person acquiring [a] security" issued pursuant to a false or misleading registration statement. By contrast, the Supreme Court made it clear in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), that Section 10(b) claims are limited to claims made by purchasers or sellers. Because the only claim asserted against Deloitte is a Section 10(b) claim, any class would have to be limited to purchasers of Hamilton common stock during the relevant period.

Cir. 2000). Thus, any purported class period for claims against Deloitte would have to be limited to purchases of Hamilton common stock between March 31, 1999 and May 16, 2001 — rather than between April 21, 1998 and June 8, 2001, as plaintiffs allege.

**II.     Class Certification Should Be Denied Because Plaintiffs Cannot Meet Their Burden Of Proving Typicality, Adequacy of Representation, And Predominance Of Common Questions.**

Plaintiffs bear the burden under Rule 23 of persuading the Court that all of the prerequisites for certifying a class are met. Among other things, Rule 23(a) requires plaintiffs to show that the claims of the putative class representatives are "typical of the claims or defenses of the class" and that the "representative parties will fairly and adequately protect the interests of the class." In addition, in order to maintain a class action under subsection (b)(3), plaintiffs must persuade the Court that common questions of fact or law predominate over individual questions and that a class action is therefore superior to allowing individual suits to proceed. If plaintiffs fail to carry their burden of showing that all of these requirements are met, class certification must be denied. *See Dyer v. Publix Super Markets, Inc.*, 2000 U.S. Dist. LEXIS 4455, *6 (M.D. Fla. March 21, 2000) ("Plaintiffs bear the burden of establishing that they have met all four of [the Rule 23] prerequisites and of proving that class certification is warranted."); *Walmsey v. Mercury Finance Co.*, 1994 U.S. Dist. LEXIS 21344, *9 (S.D. Fla. Sept. 12, 1994) (same). Plaintiffs' motion for class certification with respect to Deloitte should be denied because they have failed to meet their burden of demonstrating either typicality, adequacy, or predominance of common issues.

**A.     The Named Plaintiffs Are Not Typical Nor Are They Adequate Class Representatives Because They Are Subject To Unique Defenses On The Issues Of Reliance And Causation.**

"[R]eliance is generally an individual issue." *Waters v. Internat'l Precious Metals Corp.*, 172 F.R.D. 479, 487 (S.D. Fla.1996). However, in the context of Section 10(b) claims,

16

individual issues of reliance ordinarily do not stand in the way of class certification because the courts employ a presumption of reliance under the fraud-on-the-market doctrine. *Id.,* citing *Basic v. Levinson,* 485 U.S. 224, 245 (1988). The fraud-on-the-market doctrine applies when there is an efficient market for the stock so that the market price of the stock can properly be deemed to reflect all available public information. *Id.* The doctrine presumes that all purchasers have relied on the integrity of the market price and therefore relied (albeit indirectly) on any material misstatements or omissions that were made in that publicly available information.

The presumption of reliance that flows from the fraud-on-the-market doctrine is, however, a rebuttable, rather than a conclusive, presumption. *See Basic,* 485 U.S. at 248; *Robbins v. Koger Properties, Inc.,* 116 F.3d at 1448; *Waters v. Int'l Precious Metals Corp.,* 172 F.R.D. at 486, 488 (holding that defendants "are entitled to rebut the presumption [of reliance] on an individualized basis [at trial]" and that "cases applying the fraud on the market presumption of reliance also indicate that the presumption is rebuttable through individualized proof"). If the defendant can show that a particular plaintiff was *not* relying on the integrity of the market price in making a decision to purchase, the presumption will be overcome and, in order to recover, the plaintiff will be required to present proof that he relied directly on the alleged misstatement.

In *Basic,* the Supreme Court gave several examples of the kind of evidence that would serve to overcome the presumption created by the fraud-on-the-market doctrine. The Court noted that a plaintiff who believed the issuer was lying could not claim to be relying on the integrity of the market price: "a plaintiff who believed that Basic's statements [denying that the company was in merger discussions] were false . . . and who consequently believed that Basic stock was artificially underpriced, but sold his shares nevertheless because of other unrelated

17

concerns . . . could not be said to have relied on the integrity of a price he knew had been manipulated." 485 U.S. at 249. So too, in this case, if Charles Roth believed that Hamilton's managers were "crooks" and that they were lying to investors, then he could not have been relying on the integrity of the market price when he continued to buy Hamilton stock.

That Roth was a market maker in Hamilton stock also creates the possibility of unique reliance and transaction causation defenses. Evidence that Roth's purchases of Hamilton stock for Winn and Albers were motivated by factors wholly unrelated to the value of Hamilton stock — such as a desire to advance Roth's own or his other clients' financial interests — would suggest that he did not rely on the integrity of the market price of the stock.[9] It would also suggest a lack of transaction causation: if Roth would have purchased the stock even if he had known the "truth," then plaintiffs would not be able to claim that their transactions were caused by the alleged fraud.

For purchases after April 14, 2000, Winn and Albers would also be subject to a unique statute of limitations defense. Plaintiffs' claims under Section 10(b) had to be brought "within one year after the discovery of the facts constituting the violation." *Lampf, Pleva Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 361-62 (1991). The one year begins to run "at the point where, in the exercise of reasonable diligence, Plaintiffs should have discovered the fraud." *Freundt-Alberti v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.Supp.2d 1298, 1301 (S.D. Fla. 2001) , *aff'd*, 2002 WL 187426 (11th Cir. Jan. 18, 2002). That point occurs when

---

9       Because Deloitte has been prevented from obtaining discovery with respect to Roth's purchases and sales of Hamilton stock for himself and his other clients, it is impossible at this point to evaluate whether Deloitte would be able to succeed on such a defense. However, the fact that Roth was a market maker and that he continued to buy Hamilton stock for Winn and Albers notwithstanding his strong feelings about management's integrity provides a reasonable basis for believing that further discovery might well lead to information that would be directly relevant to a reliance/transaction causation defense. That is particularly true since Roth continued to purchase stock *after* the restatements and even *after* Deloitte issued a going concern opinion in June 2001.

the plaintiffs should have discovered "the facts constituting a violation" — "not every intricate detail of the alleged wrongdoing." *Bitmar Corp. v. Derrickson*, 8 F.Supp.2d 1361, 1365 (M.D. Fla. 1998).

Deloitte was named as a defendant in this case on June 21, 2001; thus, any claims that plaintiffs should have discovered by June 21, 2000 are barred.  Roth admitted in his testimony that he was beginning to have misgivings about the Bank as early as March 2000.  And he also testified that he knew as early as 1999 that Hamilton had taken a $32 million ATRR reserve for regulatory accounting purposes and had chosen *not* to do so for GAAP accounting purposes. Roth at 68-69.  (Albers too was aware of that fact as a result of reading Hamilton's 1999 financial statements.  Albers at 129-32).  In addition, Roth acknowledged that he was aware, before the second restatement was announced, that Hamilton was having ongoing disputes with its regulators about whether the ATRR should be included in the Bank's GAAP financial statements.  *Id.* at 71.  If, as plaintiffs now contend, it was clear under GAAP that an OCC-mandated ATRR reserve is a minimum reserve that *must* be recorded for GAAP, as well as regulatory accounting, purposes, then Roth and Albers "discovered" the "facts constituting a violation" of the securities laws more than one year before Deloitte was added to the lawsuit.

In ruling on the motion for class certification, the Court should not, of course, attempt to decide the merits of the proposed class members' claims.  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974).  However, the fact that the named plaintiffs are subject to unique defenses concerning reliance, causation and statute of limitations renders them atypical and inadequate as class representatives.  *See Roseman Profit Sharing Plan v. Sports & Recreation*, 165 F.R.D. 108, 110 (M.D. Fla. 1996) ("where reliance on integrity of the market is subject to serious dispute . . . a unique defense exists and plaintiff fails to satisfy the typicality

19

requirement"); *Newman v. Eagle Building Technologies*, 2002 WL 2031561 at *5 (S.D. Fla. July 31, 2002) (noting that "unique defenses . . . might imperil certification of a class" in a securities fraud action); *Goldman v. Alhadeff*, 1990 WL 86882 at *2 (W.D. Wash. Feb. 1, 1990) ("Lack of reliance by the class representatives has been found by courts to be a unique defense which precludes class certification"); *McNichols v. Loeb Rhoades & Co., Inc.*, 97 F.R.D. 331, 334 (N.D. Ill. 1982) (courts "have recognized that the defense of nonreliance on the integrity of the market when raised against the named plaintiff in a fraud on the market case may destroy the typicality of his or her claims"); *see also Hively v. Northlake Foods, Inc.*, 191 F.R.D. 661, 668 (M.D. Fla. 2000) ("Typicality is not present if the class representatives are subject to unique defenses that could be central to the litigation").

"[W]here it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass, then the named plaintiff is not a proper class representative." *Hall v. Burger King Corp.*, 1992 WL 372354 at * 9 (S.D. Fla. Oct. 26, 1992). The reason for this rule is that unique defenses tend to consume all of the parties' attention and energy, drawing it away from what must be the critical question in any class action, which is whether the class as a whole is entitled to recover. *See Auto Ventures, Inc. v. Moran*, 1997 WL 306895 at *5 (S.D. Fla. Apr. 3, 1997).

In this case, Mr. Roth was involved in a number of investor conference calls with Hamilton management, as well as discussions with other money managers. Although Mr. Roth denied ever trading on inside information (Roth at 73, 129-30), there is at least a question of fact as to whether he had sources of information not available to the market generally — and whether he was relying on whatever information he received privately, as opposed to publicly available information and the integrity of the market price. In addition, Mr. Roth was clearly a man of

strong opinions who decided at some point that he could *not* credit information that Hamilton management was providing to the market. Mr. Roth testified that he began having misgivings about the Bank as early as March 2000 — *before* Deloitte issued the second audit opinion at issue here.    And by November 2000, Mr. Roth was writing scathing letters to Hamilton management and (according to Mr. Albers) telling his clients that they were "crooks."

Despite his misgivings about Hamilton, Mr. Roth bought thousands of shares of stock on behalf of Messrs. Albers and Winn from March through November 2000.  And from November 2000 until May 16, 2001, he bought thousands more shares.  Indeed, even after the May 16, 2001 announcement of a restatement, he continued to buy a substantial number of shares, raising the inference that he was not — and had not been — relying on either the integrity of the market price or Deloitte's opinions for some time in making his purchases.

Whether and when Mr. Roth in fact concluded that Hamilton's public disclosures could not be trusted and why he nevertheless continued buying Hamilton stock for his clients are all issues of fact that would have to be explored at trial.  Because these issues are unique to the proposed class representatives, they are precisely the kinds of issues that defeat typicality and adequacy.

## B.    Plaintiffs Cannot Show That Common Questions Predominate Over Individual Questions.

Plaintiffs' motion for class certification should also be denied because plaintiffs cannot carry their burden of showing that common questions predominate over individual questions of fact.  As the Supreme Court itself recognized in *Basic*, the fraud-on-the-market doctrine is central to the Court's ability to certify a class. 485 U.S. at 242;  *In re Amerifirst Securities Litigation*, 139 F.R.D. 423, 430 (S.D. Fla. 1991); *O'Neil v. Appel*, 165 F.R.D. 479, 500 (W.D. Mich. 1996).  If the market is not efficient, then each plaintiff must individually prove reliance,

which will destroy the necessary predominance of common issues. *See O'Neil*, 165 F.R.D. at 499 ("If, therefore, a fraud-on-the-market theory is not reasonably available to plaintiffs and individual proof on [the issues of reliance and causation] is necessary, common questions will not predominate."); *see also In re Seagate Technology II Securities Litigation*, 843 F. Supp. 1341, 1356-57 (N.D. Cal. 1994) (discussing the importance of the fraud-on-the-market theory to "tip th[e] balance in favor of the common questions."). A number of courts have denied class certification on the ground that the evidence showed that the market was not efficient, that the fraud-on-the-market doctrine and the presumption of reliance therefore did not apply, and that the requirement that the plaintiffs prove reliance on an individualized basis defeated predominance. *See Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001); *Serfaty v. Int'l Automated Systems, Inc.*, 180 F.R.D. 418, 421-23 (D. Utah 1998).

"In order for the market theory to apply . . . a plaintiff must show that the market in which the stock traded was 'efficient.' . . . An efficient market has been defined as one that obtains material information about a company and rapidly reflects that new information in the price of the stock." *In re AmeriFirst Securities Litigation*, 139 F.R.D. at 430. The court in *In re AmeriFirst* listed the following factors in assessing the efficiency of a market: "(1) a large weekly trading volume, (2) a significant number of securities analysts followed and reported on the company's stock during the applicable period, (3) the stock had numerous market makers and arbitrageurs, (4) the company was entitled to file an S-3 Registration Statement in connection with public offerings . . . , and (5) an historical showing of immediate price response to unexpected corporate events or financial releases." *Id.*

Applying these factors, Deloitte's expert, Dr. Fred Dunbar, has opined that the market for Hamilton stock was *not* efficient during the class period. Dunbar Report, attached hereto as

Exhibit G.[10]   Among other things, Dr. Dunbar considered significant the fact that Hamilton's stock was very thinly-traded and that the market price of the stock did not react quickly and accurately to firm-specific news.[11]   For example, Dr.  Dunbar pointed out that on at least two occasions when negative news was disclosed, the stock price either failed to react or it increased. The first occasion was the announcement of the December 22, 2000 restatement, which was followed by a rise in the price of Hamilton stock, rather than a decrease.[12]   The second was immediately after Hamilton announced an earnings shortfall on April 3, 2001, when the price of the stock rose by a statistically significant amount, even though in an efficient market it presumably would have fallen in response to such news.   After studying the movement of Hamilton stock, Dr. Dunbar pointed out that the market price did not appear to be moving in response to market information.   Instead, a statistically significant change in price was just as likely to occur on days when there was no firm-specific news concerning Hamilton as it was on days when there was such news.  *Id.* at 7.

Apart from these questions concerning the efficiency of the market for Hamilton stock, Mr. Roth's testimony suggests that there are likely to be many individualized issues concerning reliance. Mr. Roth himself bought Hamilton stock for a dozen or more clients (Roth at 19),

---

[10]    The attached Dunbar Report has a finalized Exhibit 5, which replaces the original preliminary Exhibit 5. The Report itself, including its conclusions and all other exhibits, remain unchanged from the Report originally filed in August 2002.

[11]    Roth himself described Hamilton's stock as "thinly traded" in his November 2000 letter to Hamilton management. *See* Ex. F.

[12]    The market reaction to the December 22, 2000 restatement announcement is particularly significant for plaintiffs' claims against Deloitte. The fact that the market price went up following that announcement must mean either than the market was not efficient — in which case, plaintiffs must prove reliance on an individualized basis — or that plaintiffs cannot prove that the information that was allegedly misstated was material or cannot show loss causation under the *Robbins* test — and therefore cannot prevail on the merits of their claim.

creating potentially individualized issues of fact like those outlined above with respect to each of those class members.  In addition, Mr. Roth identified a number of money managers who were buying Hamilton stock for their clients and who participated in various conference calls with Hamilton management — conference calls that became increasingly heated as participants questioned the integrity and competence of Hamilton management.   Roth at 68-69, 75-76. Deloitte is entitled to inquire into the specifics of each of these money managers' purchases of stock to determine whether (even assuming that the market was an efficient one) they were relying on the integrity of the market price of Hamilton stock or whether they were making judgments based on other, unrelated factors. *See Waters v  International Precious Metals Corp.*, 172 F.R.D. at 486 (defendants are entitled to rebut the presumption of reliance on an individualized basis).

In light of the unique defenses to which the proposed class representatives here are subject and the likelihood that the litigation will devolve into a series of individualized inquiries into the reasons why class members (or their investment advisers) decided to buy Hamilton stock, Deloitte urges the Court to deny plaintiffs' motion to certify a class with respect to the claims asserted against it.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for class certification should be denied.  In the alternative, in the event that the Court decides to certify a class with respect to the claims

made against Deloitte, that class should be limited to purchasers of Hamilton stock during the period from March 31, 1999 through May 16, 2001.

Respectfully submitted,

DELOITTE & TOUCHE LLP

Date:  October 15, 2002

By: _____
One of its Attorneys

Rudolph F. Aragon
Paul J. Schweip
ARAGON, BURLINGTON, WEIL &
CROCKETT, P.A.
Office in the Grove, Penthouse
2699 South Bayshore Drive
Miami, Florida 33133
e-mail: raragon@abwc.com
        pschwiep@abwc.com
Tel. No.: 305/858-2900
Fax No.: 305/858-5261

Alan N. Salpeter
Daniel J. Delaney
Bennett E. Kaplan
MAYER, BROWN, ROWE & MAW
190 South LaSalle Street
Chicago, Illinois 60604
e-mail: asalpeter@mayerbrown.com
Tel. No.: 312/782-0600
Fax No.: 312/701-7711

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing DEFENDANT DELOITTE & TOUCHE LLP'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION was sent by United States Mail, postage prepaid, addressed to those individuals listed on the attached Master Service List on this 15th day of October, 2002.

_____
RUDOLPH F. ARAGON

## MASTER SERVICE LIST

Paul Geller, Esq.
Jonathan Stein, Esq.
CAULEY GELLER BOWMAN
   &COATES, LLP
One Boca Plaza, Suite 421A
2255 Glades Road
Boca Raton, Florida 33431
Tel: 561-750-3000
Fax: 561-750-3364

Lead Counsel for Plaintiffs – Herbert
Silverman, John Albers, James R. Winn,
Robert and Gunilla Lieberman


Kenneth J. Vianale, Esq.
R. Timothy Vannatta, Esq.
Tara Isaacson, Esq.
MILBERG WEISS BERSHAD HYNES &
   LERACH LLP
5355 Town Center Road, Suite 900
Boca Raton, Florida 33486
Tel: 561-361-5000
Fax: 561-367-8400

Co-counsel for Lead Plaintiffs– Herbert
Silverman, John Albers, James R. Winn, Robert
and Gunilla Lieberman


Pedro Julio Martinez-Fraga, Esq.
Mark Paul Schnapp, Esq.
Clement Ryan Reets, Esq.
GREENBERG TRAURIG
1221 Brickell Avenue, 19th Floor
Miami, Florida 33131
Tel: 305-579-0500

Counsel for Hamilton Defendants


J. Reid Bingham, Esq.
Genovese Joblove & Battista, P.A.
NationsBank Tower, 36th Floor
100 S.E. Second Street
Miami, Florida 33131
Tel: 305-349-2300
Fax: 305-349-2310

Counsel for Hamilton Defendants


Jonathan Cohen, Esq.
Shutts & Bowen LLP
1500 Miami Center
201 S. Biscayne Boulevard
Miami, Florida 33131
Tel: 305-358-6300

Counsel for Underwriter Defendants –
Raymond James & Associates, Inc. and
CIBC Oppenheimer Corp.


Scott D. Musoff, Esq.,
Skadden, Arps, Slate, Meacher &
   Flom LLP
Four Times Square
New York, NY 10036
Tel: 212-735-3000

Co-Counsel for Underwriter Defendants–
Raymond James & Associates, Inc. and CIBC
Oppenheimer Corp.

James M. Kaplan, Esq.
Michael C. Foster, Esq.
Wilson, Elser, Moskowitz, Edelman &
    Dicker LLP
3800 Bank of America Tower
100 S.E. 2nd Street
Miami, Florida 33131
Tel: 305-374-4400
Fax: 305-579-0261

Counsel for Twin City Fire Ins. Co.

Barry S. Rosen, Esq.
Mark S. Hersh, Esq.
Sachinoff & Weaver, Ltd.
30 S. Wacker Drive, Suite 2900
Chicago, IL 60606
Tel: (312) 207-1000
Fax: (312) 207-6400

Counsel for FDIC

Robert J. DeHenzel, Jr.
FDIC
550 17th Street, N.W.
Room H-10106
Washington, DC 20429
Tel: (202) 736-0550
Fax: (202) 736-0193

Of Counsel to FDIC

Julie L. Williams, Esq.
Attorneys Office of the OCC
250 East Street, S.W.
Washington, DC 20219
Tel.: (202) 874-5280
Fax: (202) 874-5279

Counsel for OCC in Twin City Action


Daniel J. Standish, Esq.
Jason P. Cronic, Esq.
Wiley Rein & Fielding LLP
1776 K Street, N.W.
Washington, DC 20006
Tel: 202-719-7000
Fax: 202-719-7049

Counsel for Twin City Fire Ins. Co.

Carlos F. Concepcion, Esq.
Juan R. Garcia, Esq.
Concepcion, Rojas & Santos, LLP
220 Alhambra Circle, Suite 350
Coral Gables, FL 33134
Tel: (305) 446-4000
Fax: (305) 446-7764

Counsel for FDIC

Bernardo Burstein, Esq.
Bernardo Burstein, P.A.
Rivergate Plaza, Suite 804
444 Brickell Avenue
Miami, FL 33131
Tel: (786) 425-3004
Fax: (786-425-0830)

Counsel for Hamilton Bancorp, Inc. and Individual
Hamilton Defendants in Twin City Action

# EXHIBIT

# A

**Delaney, Daniel J.**

| | |
|---|---|
| **From:** | Jack Reise [reise@classlawyer.com] |
| **Sent:** | Wednesday, June 05, 2002 4:25 PM |
| **To:** | Delaney, Daniel J. |
| **Subject:** | Letter dated 6/4/02 |

In my letter to you dated 6/4/02 responding to your 5/29/02 letter, in providing additional information re: Interrogatory no. 7, the last line should read "members", not "numbers".  In addition, in light of the fact that Gunilla Lieberman was not involved in making any investment decisions, we are inclined to withdraw Gunilla Lieberman as a class representative in the securities litigation.  Please let me know whether you have any opposition.

Thank you.

1

# EXHIBIT

# B

# FILED
# UNDER
# SEAL

# EXHIBIT

# C

**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF MIAMI

MIAMI DIVISION

CASE NO. 01-CIV-0156-GOLD/DUBE

THE VIDEO DEPOSITION OF CHARLES ANDREW ROTH

July 12, 2002

IN RE HAMILTON BANCORP, INC.,

SECURITIES LITIGATION

PURSUANT TO NOTICE, the video deposition of CHARLES ANDREW ROTH was taken on behalf of Deloitte Touche, LLP, pursuant to the pertinent Federal Rules of Civil Procedure, at 10:02 a.m., this date, at Sherman & Howard, L.L.C., 633 Seventeenth Street, Suite 3000, Denver, Colorado, before Wendy Renfrow, Notary Public and Registered Professional Reporter, State of Colorado.

**Page 2**

# APPEARANCES:

For the Lead Plaintiffs - Herbert Silverman, John Albers, James R. Winn, Robert and Gunilla Lieberman, and the Deponent Charles Andrew Roth:

    MAYA S. SAXENA, ESQ.

    Milberg Weiss Bershad Hynes & Lerach, LLP

    The Plaza

    5355 Town Center Road, Suite 900

    Boca Raton, Florida 33486

    TELEPHONE: (561) 361-5000

For the Hamilton Defendants - Hamilton Bancorp, Inc., Eduardo A. Masferrer, John M.R. Jacobs, Maria Ferrer-Diaz:

    SUSANA BETANCOURT, ESQ.

    Greenberg Traurig, P.A.

    1221 Brickell Avenue

    Miami, Florida 33131

    TELEPHONE: (305) 579-0514

**Page 3**

Appearances: (Continued)

For the Underwriter Defendants - Raymond James & Associates, Inc. and CIBC Oppenheimer Corp.:

    JEREMY A. RIST, ESQ.

    Skadden, Arps, Slate, Meagher & Flom, LLP

    Four Times Square

    New York, New York 10036

    TELEPHONE: (212) 735-3000

For Deloitte & Touche, LLP:

    ALAN N. SALPETER, ESQ.

    Mayer Brown Rowe & Maw

    190 South LaSalle Street

    Chicago, Illinois 60603

    TELEPHONE: (312) 701-7051

The Videographer: Timothy L. Ortmeier, CLVS

**Page 4**

THE VIDEOGRAPHER: We are on the record at 10:02. Today is July 12th, 2002. This is the beginning of Tape Number 1 of the video testimony of Charles Andrew Roth taken in reference to the Hamilton Bancorp, Incorporated Securities Litigation, Case Number 01-CIV-0156, in the United States District Court for the Southern District of Miami in the Miami Division.

Today we are located at 633 17th Street, Suite 3000, in Denver, Colorado. I am Timothy L. Ortmeier, a certified legal video specialist, of Ortmeier Video Services. The court reporter is Wendy Renfrow.

Will all attorneys present please introduce themselves?

MR. SALPETER: Yes. Good morning. My name is Alan Salpeter. I'm from the Mayer Brown firm in Chicago. And in this matter I represent Deloitte & Touche, LLP.

MS. BETANCOURT: Good morning. My name is Susana Betancourt. I'm from the firm of Greenberg Traurig. I represent Hamilton Bancorp and the individual defendants.

MR. RIST: My name is Jeremy Rist. I am from the New York office of Skadden Arps,

**Page 13**

1   Q. All right. Let me show you a letter
2 that was previously marked as Defendant's Exhibit
3 5.
4    MR. SALPETER: I think what I'll do
5 is if a document was previously marked as such,
6 I'll just refer to it that way.
7    MS. SAXENA: That's fine.
8    MR. SALPETER: If not, we'll just
9 name things Roth 1 through whatever.
10   Q. Is this the conference you were
11 referring to just --
12   A. Yes, sir.
13   Q. So you first heard about or learned
14 about Hamilton Bank in June of '99?
15   A. Yes, sir. Apparently.
16   Q. Okay. And did you write this letter
17 to Mr. Bernace?
18   A. I did.
19   Q. Did you get a response --
20   A. No.
21   Q. -- to this letter, Defendant's
22 Exhibit 5?
23   A. No, I did not.
24   Q. Did you send copies of this letter
25 to anybody?

**Page 14**

1   A. Not to my knowledge, or it would
2 have been indicated there.
3   Q. When you said "Our interest would
4 range up to 100,000 shares" in the middle of the
5 letter, Defendant's Exhibit 5, were you referring
6 to your own accounts, your own personal accounts?
7   A. Yes, sir.
8   Q. And your firm's accounts?
9   A. Well, the firm's accounts would be
10 my accounts.
11   Q. Okay. So you weren't necessarily
12 referring to clients?
13   A. I was.
14   Q. Oh, you were?
15   A. Sure.
16   Q. So you were referring to both
17 personal holdings as well as client holdings?
18   A. Well, the personal holdings would be
19 minimal compared to the totality of client
20 holdings.
21   Q. Okay. Was there any follow-up at
22 all to this letter of June 7, 1999, Defendant's
23 Exhibit 5?
24   A. None to my recollection.
25   Q. Okay. But this does signal the

**Page 15**

1 start of your interest in Hamilton Bank?
2   A. It does.
3   Q. Okay. Thank you. What licenses do
4 you hold?
5   A. I hold a license as a registered
6 representative, a registered principal. I don't
7 know whether I hold a license as a registered
8 financial principal. And then there are various
9 state licenses that I also hold. I think it's a
10 Series 63 or something. I'm not very conversant
11 with that regulatory component of the operation.
12 My assistant is.
13   Q. Are you up to date on your licenses?
14   A. I am, so far as I know.
15   Q. If not, it's her fault. How long
16 have you been in the brokerage business?
17   A. Since August of 1952.
18   Q. So we're getting close to 50 years
19 here, right?
20   A. Yes, sir.
21   Q. Have you invested, either for
22 yourself or for clients, in other bank stocks
23 over the past five years?
24   A. Yes, sir.
25   Q. Have you invested in other bank

**Page 16**

1 stocks where the bank had an interest in South
2 America or Latin America?
3   A. No, sir.
4   Q. Is this the only one?
5   A. None to my knowledge.
6   Q. Okay. Other than saying what you
7 have already said about specializing in insurance
8 stocks and to a lesser extent bank stocks, are
9 there other areas of specialty where you have
10 done work?
11   A. Well, I -- as an agent, I have
12 bought and sold a lot of stocks and bonds over
13 the years. But by default or otherwise, I have
14 always gravitated toward the insurance industry
15 and secondarily the banking industry.
16   Q. Does your firm buy stock for its own
17 account?
18   A. Not really.
19   Q. Did you in the Hamilton case?
20   A. The firm did not buy stock in
21 Hamilton.
22   Q. Did you personally buy stock in
23 Hamilton?
24   A. I had owned stock at various times,
25 yes.

Page 17

```
 1    Q.  During the period '99, 2000, and
 2  2001, did you personally buy stock in Hamilton?
 3    A.  I probably did, but I can't pinpoint
 4  with any accuracy the times.
 5    Q.  Okay.  Do you remember the highest
 6  number of shares you held, even though you may
 7  not remember the specific date?
 8    A.  I may have held a few thousand
 9  shares.  I'm not sure.
10    Q.  Okay.  Did your firm ever own
11  Hamilton stock as a firm?
12    A.  Only on a transitory or overnight
13  basis.  We moved any stock into an account and it
14  wasn't immediately allocated to customers.  It
15  may have resided overnight in what we call a
16  trading account and then it went out the next
17  day.
18    Q.  Other than that, that transitional
19  type ownership, did your firm buy and hold any
20  Hamilton Bank stock?
21    A.  Did not.
22    Q.  After you went to this conference in
23  June of 1999, did you do anything else to inform
24  yourself about Hamilton Bank before recommending
25  it to clients?
```

Page 18

```
 1    A.  Well, Hamilton's presentation at the
 2  conference was accompanied by a distribution of
 3  an investment packet.  And I took one or more
 4  along with me back home and reviewed the
 5  materials that were distributed.
 6    Q.  And obviously something impressed
 7  you?
 8    A.  Well, their presentation impressed
 9  me.  And then I looked at the published financial
10  statements and it seemed to confirm what they
11  were saying.
12    Q.  How soon after this conference did
13  you put clients into Hamilton Bank stock?
14    A.  Within the next few trading days,
15  three or four trading days, I suspect that the
16  activity started.  I would have to look at our
17  records.
18    Q.  What did you like about Hamilton?
19    A.  Well, their presentation discussed
20  the trade finance activities that they were
21  involved in.  And it just wasn't another
22  community bank where they were confined to a
23  certain geographic area and that their growth
24  depended on either increasing market share at the
25  expense of others or going out into other areas
```

Page 19

```
 1  where they were not then located.  And this had a
 2  different focus in that its market area was
 3  Central America and the Caribbean.
 4    Q.  Did you find that a positive?
 5    A.  I didn't know whether it was a
 6  positive or not.  But the way they explained
 7  their particular banking functions, it sounded
 8  like a positive to me.
 9    Q.  How many clients did you put into
10  Hamilton Bank stock within a couple of months of
11  the conference in California?
12    A.  Again, I don't have access to my
13  records.  They have all been surrendered to our
14  counsel.  But my guess is that it might have been
15  a dozen or two.  I don't have that many
16  individual accounts.  Many of them are
17  institutions.
18    Q.  Now, Dr. Albers is one of your
19  clients, right?
20    A.  Yes, sir.
21    Q.  And how did you first get acquainted
22  with Dr. Albers?
23    A.  He was referred to me by someone
24  else, and I picked up the phone one day and he
25  was on the other end.
```

Page 20

```
 1    Q.  Have you ever met him in person?
 2    A.  Once.
 3    Q.  How many years have you been dealing
 4  with him?
 5    A.  I don't know.  Possibly eight to ten
 6  years, I think.
 7    Q.  And who was the intermediary or the
 8  mutual friend that introduced the two of you?
 9    A.  I don't know.  I don't know who
10  referred him to me.
11    Q.  Okay.  Did you have discretion over
12  his accounts and his trading?
13    A.  I didn't exercise discretion in his
14  account.
15    Q.  Did you have it, though?
16    A.  I think I had it, yes.  I think I
17  still have it.  But I call Dr. Albers whenever I
18  make a trade in his account.
19    Q.  We took his deposition recently.  I
20  don't remember the exact date.  And he said that
21  you pretty much had carte blanche with respect to
22  his trading.  Do you agree with that?
23    MS. SAXENA:  Objection; misstates
24  the witness's testimony.
25    A.  I always called Dr. Albers and
```

**Page 45**

1  seen these schedules here, these exhibits.
2     Q.  Okay.  Can we go to Defendant's
3  Exhibit 2, which is the Albers margin account?
4  And are you able to go down this list and just
5  tell us what factors led to these -- each of
6  these trades?  In other words, back in July of
7  '99 when you bought a thousand shares for Albers'
8  margin account, can you tell us what was going
9  through your mind then?
10     A.  Not really.  I had been introduced
11  to Hamilton and had been intrigued by the
12  presentation.  And I returned to my office and
13  determined that I would start taking positions in
14  Hamilton in customer accounts.
15     Q.  Was Albers the only one at that
16  time?
17     A.  No, sir.
18     Q.  You were doing it for other accounts
19  as well?
20     A.  Yes.
21     Q.  All right.  If you look at the other
22  Albers chart, Defendant's Exhibit 3, the IRA
23  account, you had made two prior trades; a
24  purchase of 5,000 shares in June of '99.  Do you
25  see that?

**Page 46**

1     A.  Yes, I do.
2     Q.  Now, did you discuss that with
3  Albers before actually making the trade?  Maybe,
4  maybe not?
5     A.  Probably, but I --
6     Q.  Can't be sure?
7     A.  I can't be sure.
8     Q.  But if you didn't talk to him before
9  the trade, then you would have told him
10  afterwards, is that right?
11     A.  Yes, I would have more than likely
12  discussed it before the trade, but I don't know.
13     Q.  I mean, did you have a discussion
14  with him about we're going to put approximately
15  $200,000 or $175,000 in this stock from that
16  account?
17     A.  I don't believe so.
18     Q.  I think I already asked you about
19  the two sales of 500 shares each, and you said
20  you didn't remember what prompted that, whether
21  that was just an effort to free up cash for
22  another trade?
23     A.  I don't know.
24     Q.  At that point in time, in March of
25  2000, you were still positive about Hamilton

**Page 47**

1  Bank, were you not?
2     A.  Yes, I was.
3     Q.  When in your mind did you --
4     A.  Pardon me.  What date are you
5  talking about?
6     Q.  March of 2000.  I'm looking at
7  Defendant's Exhibit 2, the Albers margin account,
8  where there is sales of 500 shares on March 16
9  and March 20 of 2000.  But then after that
10  there's still a number of purchases.  So that led
11  me to speculate that maybe you were just selling
12  those blocks to free up cash for some other
13  trade.
14     A.  Well, your speculation may be better
15  than mine, but by that time I was becoming
16  somewhat skeptical.
17     Q.  But then look at the trades after
18  that.  You still bought a lot after March of 2000
19  in that account.
20     A.  That's correct.
21     Q.  And then look at Roth Exhibit 1, the
22  Winn account.  After March of 2000 you're still
23  buying a lot of stock for Mr. Winn's margin
24  account, right?
25     A.  Yes.

**Page 48**

1     Q.  Even after the stock has tumbled by
2  50 percent, you're still buying it for his
3  account?
4     A.  What date are you referring to?
5     Q.  Just those last few sales -- I'm
6  sorry, those last few purchases.  June of '01,
7  July of '01, even August of '01, the stock is
8  down at 6, assuming these numbers are right, so
9  it's dropped over $10 a share, and you're still
10  buying it.
11     MS. SAXENA:  Objection;
12  argumentative.
13     Q.  Is that true?
14     A.  Well, obviously if these are
15  accurate, these summaries, then I was still
16  buying it.
17     Q.  Okay.  But were you skeptical at
18  that point in time?
19     A.  I certainly was, yes.
20     Q.  Were you speculating at that time?
21     A.  I can't recall.  I may have been
22  giving -- been getting information that later
23  proved to be fallacious.
24     Q.  Was that information from Usdan?
25     A.  Not just Usdan, but -- because Usdan

Page 57

1 to about $3 a share you're beginning to take your
2 clients out of that stock?
3   A.  Yes, sir.
4   Q.  What was it that switched your
5 thinking?
6   A.  I thought we better throw in the
7 towel.
8   Q.  Is that what you were doing when you
9 started to sell in August of '01?
10   A.  Yes.
11       MR. SALPETER:  Why don't we just
12 take a five-minute break.  We have been going for
13 almost an hour and a half.
14       THE VIDEOGRAPHER:  We are going off
15 the record at 11:19.
16       (A recess was taken.)
17       THE VIDEOGRAPHER:  We are back on
18 the record at 11:25.
19   Q.  Mr. Roth, did you ever tell Dr.
20 Albers that you thought the Hamilton people were
21 crooks?
22   A.  Not to my knowledge.
23   Q.  Let me read you something from Dr.
24 Albers' deposition and see if that refreshes you
25 at all.  This deposition was taken in Miami on

Page 58

1 June 25th of this year.  I'm just going to give
2 you a little context here.  He is discussing your
3 conversation with you on page 69, line 19.  And
4 the question is: "This is a conversation you
5 recall occurring in November or December of
6 2000?"
7       Answer: "Well, it was probably
8 several conversations after that time,
9 particularly after the first of the year.  He
10 told me he was going to try and sell out."
11       Question: "As best as you can, I
12 would like you to focus on the first conversation
13 with Mr. Roth after the stock price dropped.
14 Limiting it to that conversation, can you tell me
15 what Mr. Roth said?"
16       Answer: "They were crooks.  That
17 sums it up pretty much.  He may have explained
18 that more, that they were crooks."
19       Question: "Can you recall anything
20 more specific that he said in this first
21 conversation?"
22       Answer: "They were crooks because
23 they gave misleading statements and being
24 investigated by the SEC and the OCC, which was
25 withheld.  It wasn't withheld, but that there was

Page 59

1 some way that they were saying it didn't amount
2 to very much, the investigation of the OCC and
3 the SEC.  That's about all I can recall."
4       That's what Dr. Albers told us at
5 his deposition.  Does that help you remember at
6 all that either at the end of 2000 or the very
7 first part of 2001 you said to Dr. Albers the
8 Hamilton people were crooks?
9   A.  It does not.  I cannot recall
10 suggesting to Dr. Albers that they were either
11 crooks or anything resembling that.  At that time
12 the only thing I had to go on were the failed
13 guidance statements one quarter after another,
14 always promising that things would get better,
15 that the regulatory travails were behind them,
16 and we were going to go onward and upward.  But I
17 can't recall emphasizing to Dr. Albers that I
18 knew these people were crooks.
19   Q.  Do you remember thinking in your
20 mind that they were crooks, even if you didn't
21 say it?
22   A.  Well, as it turned out, the
23 quarterly news releases and the financial
24 statements were not ones of biblical veracity.
25 They were fictions and phony.  And I concluded

Page 60

1 that we had to get out now.  There is a
2 difference between mismanagement and actual
3 fraud.
4   Q.  I'm focusing on the Albers testimony
5 where he said --
6   A.  Well, Albers' testimony is his
7 testimony.  It's not mine.  And he is relating
8 comments from me that I don't recall, so --
9   Q.  Well, do you deny ever saying to
10 him --
11   A.  I do not.  But I do not recall -- I
12 don't have in my memory that I made those
13 statements that I emphatically said or
14 any other -- even in a reserved sort of way
15 saying that these people were crooks.
16   Q.  Do you remember thinking at the end
17 of 2000 or the beginning of 2001 that they might
18 be crooks?
19   A.  Well, that's really reaching.  I
20 can't remember what I thought at the time.  But I
21 can tell you that I became increasingly
22 disillusioned with these financial statements
23 that were, in my opinion looking back, accounting
24 jujitsu.  And they just didn't track after a
25 while.

CHARLES ANDREW ROTH     CondenseIt!™     July 12, 2002

Page 65

1 upon what you saw with respect to the insider
2 sales?
3    A. No, sir, I do not.
4    Q. Is it common in your practice to
5 track the insider sales?
6    A. Yes, sir.
7    Q. Again, for what reason?
8    A. Well, if management is a concerted,
9 continuous seller, it's a warning sign.
10    Q. Did you make handwritten notes of
11 your own from time to time as you were trading
12 for Winn and Albers?
13    A. No, sir.
14      MR. SALPETER: Other than what's
15 been produced, are there any other documents from
16 Mr. Roth or his firm that haven't been produced?
17      MS. SAXENA: Not to my knowledge,
18 other than what we mentioned before, the
19 consulting agreements, if in fact those have been
20 requested.
21    Q. Did you keep annual reports of
22 Hamilton Bank?
23    A. My assistant kept a file on Hamilton
24 Bank. And I believe we kept annual reports,
25 proxy statements.

Page 66

1    Q. What about news articles?
2    A. News articles. News releases. News
3 articles. In the case of Hamilton, there may
4 have been an occasional outside source that we
5 generally don't consult, The American Banker. I
6 can recall an article or two in The American
7 Banker about the company.
8    Q. As you got information in about
9 Hamilton of the type you just described, did you
10 send that information to Winn and Albers?
11    A. I did not send 10-Qs. I did not
12 send 10-Ks. They get automatically through Ernst
13 any information distributed by the company to
14 shareholders. So they get the annual reports.
15 And if the annual report would contain a 10-K, as
16 it does in some companies, they would get that.
17 Obviously they got proxy statements.
18    Q. Put aside what they get from the
19 company directly. Did you send them any
20 additional information about Hamilton?
21    A. I did. I occasionally sent them
22 news releases, which would have been received
23 weeks prior to the routine way that Ernst
24 distributes news releases if they go to the
25 depository institutions. And I would also send

Page 67

1 them analytical reports if I thought them
2 interesting enough.
3    Q. Did you ever have the '98 annual
4 report for Hamilton Bank?
5    A. I may have, yes, sir, but I don't
6 know for sure.
7    Q. Do you know what the purpose is of
8 regulatory accounting principles as opposed to
9 GAAP?
10    A. Yes.
11    Q. What is the purpose of regulatory
12 accounting principles?
13    A. To protect the condition of the bank
14 and its depositors.
15    Q. Now, at the time you put Albers and
16 Winn into Hamilton Bank, did you know it was
17 regulated by the OCC?
18    A. Yes.
19    Q. And did you know that one of the
20 important measures of a bank's financial health
21 is the regulatory capital?
22    A. Yes, sir.
23    Q. How does regulatory capital affect
24 the business of the bank?
25    A. Well, the regulatory capital may

Page 68

1 inhibit the business of a bank going forward if
2 it's impaired.
3    Q. What does it mean to be impaired?
4    A. Insufficient capital.
5    Q. According to who or what?
6    A. According to the OCC.
7    Q. Had you -- prior to the drop in the
8 stock price, were you aware that there was a
9 $32,000,000 transfer risk reserve for regulatory
10 purposes only at Hamilton Bank?
11    A. Prior to what date?
12    Q. Let's say prior to 2001.
13    A. Oh, yes, I was aware at that time.
14 I was not aware that there were transfer risk
15 issues with the OCC when I was first introduced
16 to the company in 1998, I guess it was.
17    Q. When did you first focus on this
18 transfer risk reserve? When did you first become
19 aware of it? When did it first come under your
20 radar screen?
21    A. When the management in its quarterly
22 teleconference calls took issue with the -- and
23 took exception to the OCC requiring additional
24 amounts of transfer risk reserve.
25    Q. Did you understand that this item,

Page 69

1 this $32,000,000 item that I was asking about,
2 was a transfer risk reserve relating to the
3 bank's exposure in Ecuador?
4     A. I did, yes, because it was discussed
5 in the teleconference calls.
6     Q. So you knew it from the
7 teleconference calls?
8     A. I did.
9     Q. Were those conference calls with
10 analysts?
11     A. Yes, they were teleconference calls
12 immediately after the release of quarterly
13 statements.
14     Q. Did you also understand from the
15 1999 financial statements that this transfer risk
16 reserve was spelled out in the footnotes?
17     A. I assume that it was.
18     Q. Okay. Did you know what the
19 regulators' position was with respect to this
20 transfer risk reserve versus what the company's
21 position was?
22     A. Of course not. We only got the
23 version from the company. The regulators were
24 never on the teleconference calls.
25     Q. No, but did the company tell you

Page 70

1 what the regulators were arguing?
2     A. They suggested that they were being
3 maltreated by the regulators.
4     Q. But aside from the pejoratives and
5 the characterizations, did they tell you what the
6 regulators' position was?
7     A. Not that I recall.
8     Q. Did you know, for example, that the
9 regulators thought that 90 percent of the
10 Ecuadorian loans should be written off?
11     A. No, they didn't ever say that. What
12 they said was that the loans were on an accrual
13 status, not on a nonaccrual status and things
14 were great.
15     Q. Did you discuss with Winn and Albers
16 this whole topic of the transfer risk reserve, or
17 did you not get into that level of detail with
18 them?
19     A. Well, I told them that the
20 management -- as I recall, I suggested that the
21 management had a grave difference of opinion with
22 the regulators, the regulators were being overly
23 sensitive, and that the management claimed that
24 despite the fact that they were forced to put up
25 the reserves, that the loans reserved against

Page 71

1 were still in good standing. They were still
2 paying principal and interest as scheduled.
3     Q. So as of late 2000 or maybe even
4 earlier than late 2000, you knew about this
5 dispute between the regulators and the company
6 over transfer risk reserves?
7     A. I did.
8       MS. SAXENA: Objection; misstates
9 prior testimony.
10     Q. You did or did not? You did or
11 didn't know about the dispute?
12     A. The dispute was a publicized dilemma
13 that the company was continuously facing.
14     Q. Okay. So you knew about the dispute
15 and you knew about the approximate size of the
16 dispute, is that right?
17     A. The size of the dispute may have
18 been mentioned by the management in the
19 teleconference calls. I don't know.
20     Q. And had you told your clients about
21 the dispute and the size of the dispute?
22     A. I alluded to the dispute with these
23 clients, yes.
24     Q. Okay. And you knew that the dispute
25 involved at least the general subject of GAAP

Page 72

1 versus regulatory accounting?
2       MS. SAXENA: Objection;
3 mischaracterizes prior testimony.
4     Q. Is that right?
5     A. No, I did not discuss with the
6 clients any differences between GAAP and
7 regulatory accounting.
8     Q. Do you remember any of the analysts
9 discussing this whole subject of transfer risk
10 reserve as it related to these Ecuadorian loans?
11     A. I remember inquiries from analysts
12 during the teleconference calls challenging the
13 management position that they had no problems.
14     Q. Do you remember, for example, in
15 addition to the oral discussions on the
16 conference calls, do you remember CIBC issuing a
17 report in late '99 dealing with this whole
18 transfer risk issue?
19     A. I may have seen it, but I don't
20 recall.
21     Q. Do you remember Hoefer & Arnett
22 issuing a report in 2000 about the same issue?
23     A. Same answer. I may have seen it,
24 but I don't recall specifically.
25     Q. Do you remember The American Banker

Page 73

1 having an article on the issue of transfer risk
2 reserve?
3     A.  The only article I remember from The
4 American Banker was not that one.  But it was an
5 article from The American Banker that there were
6 fraudulent lending methods.  I think it may have
7 been mentioned in The American Banker.
8     Q.  Did you have access through the
9 discussions you had with these other people in
10 the industry or from any other source, did you
11 have access to nonpublic information about
12 Hamilton?
13    A.  I wish I would have, but I didn't.
14    Q.  Let's just go back to this -- do you
15 still have this June 7, 1999 letter?  Do you have
16 that here?  I'll give you this one.  This is the
17 June 7, 1999 letter that you wrote to Mr.
18 Bernace.  It was previously marked as Defendant's
19 Exhibit 5.
20        You say in the middle of this
21 letter, "If you are ever contacted by sellers, we
22 would appreciate your directing them to us."  Did
23 that ever happen?
24    A.  No.
25    Q.  And you say, "Our interest would

Page 74

1 range up to 100,000 shares or more."  Again, that
2 means an interest on behalf of clients?
3     A.  Yes, sir.
4     Q.  And then you say if you wish
5 references about you or your firm, to contact
6 Kevin -- what is it?  Merise?
7     A.  Mirise.
8     Q.  Was he a friend?
9     A.  Business associate.
10    Q.  How long had you known him?
11    A.  Two or three years maybe.
12    Q.  Okay.  Had you done business -- a
13 lot of business with Hoefer & Arnett?
14    A.  I took down a private placement from
15 Hoefer.  And I also bought fairly significant
16 amounts of insurance stocks.
17    Q.  Okay.  All right.  Let's look at
18 another document.  This was previously marked as
19 Defendant's Exhibit 6.  It has Bates Number 162
20 and 163.  This is dated November 10, 2000.
21        Would you read this over, please,
22 and then I'm going to ask you a number of
23 questions about this one.
24        Did you write this letter,
25 Defendant's Exhibit 6, on or about November 10,

Page 75

1 2000?
2     A.  Yes, sir.
3     Q.  Did you send copies of it to anyone?
4     A.  I don't recall.
5     Q.  Would you have sent it to your
6 clients, or some of them?
7     A.  I don't know.  I may have.  But I
8 don't recall sending it to anyone.
9     Q.  How would you describe your state of
10 mind at the time you wrote this letter to Mr.
11 Masferrer of Hamilton Bank?
12    A.  Frustrated.  I felt as if my nose
13 was against the barbwire.
14    Q.  What were the intemperate remarks
15 that Masferrer had made in the last
16 teleconference?
17    A.  The intemperate remarks, if you read
18 the letter carefully, were not made by Masferrer.
19 They were made by people challenging Masferrer's
20 assurances that everything was all right.  And
21 they were very intemperate.
22    Q.  These were by other people on the
23 call?
24    A.  They were, yes.
25    Q.  Were they shareholders?  You

Page 76

1 couldn't really tell?
2     A.  I couldn't tell, no.
3     Q.  And what were they?  Give me an
4 example of what was said.
5     A.  Well, they were disbelief in his
6 assertions that things were getting better; that
7 there was little basis for this regulatory
8 assault on the management and the condition of
9 the bank.
10    Q.  I have never had my nose up against
11 barbwire, so I'm not sure I totally understand
12 what that means.  Could you be a little more
13 specific?
14    A.  Well, if you're down on your hands
15 and knees and a strand of barbwire is down there
16 and somebody tried to shove you forward, you
17 wouldn't feel like blowing your nose; you would
18 want to go the other direction.
19    Q.  And that's the way you felt at this
20 time?
21    A.  That's right.
22    Q.  You state in the first paragraph of
23 Defendant's Exhibit 6, "I have acquired about
24 300,000 shares of Hamilton Bancorp at prices
25 ranging from approximately $26.50 to $14."  Is

CHARLES ANDREW ROTH                CondenseIt!™                July 12, 2002

Page 85

1 Bernace at this Hoefer & Arnett bank conference
2 in San Francisco, but I don't think you gave us
3 any specifics. Do you remember any of the
4 specific things that stuck in your mind that
5 impressed you?
6    A. Their business model as a trade
7 finance bank. I had limited experience with that
8 type of institution. Virtually none that I can
9 recall.
10    Q. And was it also attractive to you
11 that much of their business was aimed at Central
12 and South America?
13    A. Not particularly. It could have
14 been aimed at anyplace.
15    Q. What was it about the business model
16 that you liked?
17    A. The fact that it was a trade finance
18 bank; that their loans turned over quickly; that
19 they were -- they may have been three-month loans
20 rather than three-year loans; and that they were
21 secured by letters of credit, warehouse receipts,
22 and other unassailable assets.
23    Q. Okay. Let's go to the next
24 document, which is a November 16, 2000 letter
25 from you, Mr. Roth, to Mr. Masferrer at Hamilton

Page 86

1 Bancorp. This was previously marked as
2 Defendant's Exhibit 7. What prompted -- did you
3 write this letter?
4    A. I did.
5    Q. What prompted this letter,
6 Defendant's Exhibit 7?
7    A. The shareholders were notified that
8 there would be a late filing.
9    Q. A late filing of what?
10    A. Apparently Form 12b-25.
11    Q. What is that?
12    A. I don't know.
13    Q. You were obviously frustrated when
14 you wrote the first letter, and at least as
15 frustrated at this point, is that right?
16    A. That's correct.
17    Q. When you said "Do something
18 constructive and do it now," what were you
19 referring to, selling the bank?
20    A. Well, yes, or resigning.
21    Q. So at this point you thought
22 management should be replaced, you personally
23 thought that?
24    A. I personally thought from speaking
25 to others that, yes, indeed, management should be

Page 87

1 replaced. I was just confirming, I suppose, what
2 others had suggested to me who were much more
3 familiar and conversant with the bank than I was
4 at the time.
5    Q. Did you think that management was
6 incompetent as of this date, November 16, 2000?
7    A. I'm sure that I must have. I may
8 have even put something in writing that I thought
9 this guy was the Joey Buttafuco of the banking
10 business, but I don't recall.
11    Q. Did you think he was crooked?
12    A. At the time?
13    Q. As of November 16, 2000.
14    A. I thought he was incompetent. I
15 didn't know whether he was crooked. As I
16 mentioned, I have had the benefit of hindsight
17 reading the complaint, or most of the complaint.
18    Q. I'm asking what you thought at the
19 time you wrote this letter.
20    A. Well, at the time I wrote the
21 letter --
22    Q. You thought he was incompetent?
23    A. I thought he was incompetent.
24    Q. And you thought he might be crooked?
25    A. I didn't know, but I should have

Page 88

1 been smart enough to assume it.
2    Q. All right. Let's show you another
3 document here. This was previously marked as
4 Defendant's 8. Did you write this letter?
5    A. I did.
6    Q. Who is James Smith? Is he a client?
7    A. Well, he manages money. He is not
8 my client, but he is a person that I dealt with
9 in Dallas. He manages a fairly large amount of
10 money and he had bought a good bit of Hamilton
11 Bancorp. How much, I don't know.
12    Q. So why were you telling Smith what
13 Usdan had told you?
14    A. Because Smith was more than an
15 interested bystander. He was a stockholder and
16 was looking around for answers, the same as I
17 was.
18    Q. Did you also tell Albers and Winn
19 the same thing, either verbally or in writing?
20    A. I don't recall.
21    Q. Did Albers and Winn know there had
22 been a two-year battle going on between Hamilton
23 Bank and the Feds?
24    A. Yes.
25    Q. How do you know that? Because you

Page 117

1 Hamilton Bancorp gave you fictitious information?
2    A. Yes. I said that I believe that
3 Hamilton Bancorp dispensed fictitious
4 information.
5    Q. When did you tell Mr. Winn that?
6    A. I don't recall.
7    Q. How do you know the information you
8 received was fictitious?
9    A. Well, I think it's been fairly well
10 established that the financial statements were
11 something other than accurate, and that the
12 restatement of earnings and financial condition,
13 even at the time the restatements were sent to
14 shareholders, probably were overly optimistic.
15    Q. I'm not sure if that answered my
16 question. My question was, how did you know that
17 the information you received was fictitious?
18    A. Well, I knew by subsequent events.
19    Q. What information were you referring
20 to at the time you were speaking to Mr. Winn?
21    A. Well, if I was speaking to Mr. Winn
22 around this time, then I was referring to
23 financial statements that ultimately established
24 the fact that prior financial statements were
25 grossly overstated.

Page 118

1     I believe that this company had a
2 leftward bias, that they took entries on the
3 right side of the balance sheet, shifted them to
4 the left side of the balance sheet, gave them
5 fiscal growth hormones and inflated the assets
6 that were in truth liabilities. It had the
7 effect of overstating earnings, over-paying
8 taxes, and inflating the book value of the stock.
9    Q. And when did you derive this belief?
10    A. I didn't have to derive it. It was
11 established as subsequent financial
12 statements, one followed the other, each a
13 restatement of a condition that wasn't fully
14 disclosed in the prior statement.
15    Q. So your belief that the information
16 you received from Hamilton Bancorp was fictitious
17 derived from the fact that there were
18 restatements?
19    A. Each quarterly disclosure was a
20 mop-up of unattended problems, perhaps overlooked
21 or concealed, I don't know which, in prior
22 quarters.
23    Q. So at this point you didn't have a
24 very high opinion of Hamilton Bancorp?
25    A. No, I didn't. I thought Hamilton

Page 119

1 Bancorp management had all the savoir faire of a
2 hemorrhoid.
3    Q. Did you communicate that to Mr.
4 Winn?
5    A. If I didn't, I should have.
6    Q. Did you communicate that to Mr.
7 Albers?
8    A. I should have started with Mr.
9 Masferrer and gone on down and eventually gotten
10 to Winn and Albers.
11    Q. When you say you should have started
12 with Mr. Masferrer, are you saying you should
13 have communicated to Mr. Masferrer that he had
14 the --
15    A. Yes, I wouldn't want to say anything
16 behind Mr. Masferrer's back that I wouldn't say
17 to his face. But I never could communicate with
18 him. It was only by indirection.
19    Q. Did anyone ever tell you that you
20 could not speak to Mr. Masferrer directly?
21    A. No.
22    Q. Did you ever attend the shareholder
23 meeting held in Miami, Florida?
24    A. I didn't.
25    Q. Did you ever visit Miami, Florida

Page 120

1 from 1998 to 1999?
2    A. I did not.
3    Q. So just to get my chronology right,
4 sometime around February 2001 you were of the
5 opinion that Hamilton Bancorp management had the
6 savoir faire of a hemorrhoid, is that correct?
7    A. I did. That's correct.
8    Q. Any particular reason why you chose
9 to buy an additional 33,000 shares of Hamilton
10 Bancorp from May 2001 to --
11    A. On the perhaps hope and reliance on
12 information that the bank itself was going to be
13 salvaged through either recapitalization or sale
14 to another group.
15    Q. And who did you receive that
16 information from?
17    A. Oppenheimer, who was engaged to --
18 Oppenheimer, the firm, was engaged to seek a
19 solution to the then problems of Hamilton Bank,
20 and other people who communicated with management
21 had access to Mr. Bernace or Mr. Masferrer.
22    Q. And when you say other people that
23 had access, you already testified Mr. Usdan. Is
24 that who you were referring to?
25    A. Pardon me?

Page 129

1  I can't recall.
2     Q.  And after you attended this meeting,
3  did you also read some press releases issued by
4  the company?
5     A.  I did.
6     Q.  And did you find the financial
7  statements or the financial information included
8  in those press releases to be positive?
9     A.  Very positive.
10    Q.  Okay.  And based on reading those
11 later press releases, did they confirm what you
12 learned in this Hoefer & Arnett meeting about the
13 company in general?
14    A.  Initially they did.
15    Q.  And when you read these later press
16 releases, was the positive information included
17 in those press releases a reason why you may have
18 decided to purchase Hamilton stock for your
19 clients during 1999?
20    A.  Yes.
21    Q.  Okay.  And did you continue reading
22 press releases throughout 2000?
23    A.  Press releases and anything else
24 available.
25    Q.  Okay.  Did you ever purchase

Page 130

1  Hamilton stock based on nonpublic information?
2     A.  No, ma'am.
3     Q.  You mentioned earlier about some
4  sources that were closer to management that you
5  may have generally discussed Hamilton Bank with.
6  What did those sources generally tell you about
7  Hamilton?
8     A.  Only -- they relayed only comments
9  relayed apparently to them by the management and
10 then on to me.  And as I recall, there wasn't
11 anything particularly proprietary about them or
12 not public.  It just seemed to confirm the onward
13 and upward predictions of what we were getting in
14 the press releases.
15    Q.  Did Ms. Diaz ever tell you any
16 nonpublic information about Hamilton?
17    A.  She didn't tell me much of anything.
18    Q.  And you testified a little bit
19 earlier that at some point you learned that
20 Hamilton may have been a takeover target.  Do you
21 recall that?
22    MS. BETANCOURT:  Object to form.
23    A.  Not as much a takeover target.  I
24 don't think that's the word I used.  It would
25 be -- would have been a recapitalization from

Page 131

1  outside sources or perhaps an acquisition by
2  another larger bank interested in trade finance.
3  But a takeover target infers to me that it might
4  have been a hostile acquisition of stock and
5  subsequent takeover with the approval of the
6  Federal authorities.
7     Q.  Okay.  During sometime in 2001 did
8  you read any news articles or press releases
9  indicating that the company, Hamilton, might be
10 acquired by another entity?
11    A.  Well, there were articles in, as I
12 recall, Baron's and perhaps other periodicals
13 where bottom fishers had taken positions in the
14 stock in New York.
15    Q.  Did you think that a possible
16 acquisition of Hamilton in 2001 would be a way
17 for you to recoup some value for your clients?
18    MS. BETANCOURT:  Object to form.
19    Q.  You can answer.  She just objected
20 to the form of my question.
21    A.  Oh.  I thought that that would have
22 been the only hopeful exit strategy that we then
23 had available to us.
24    Q.  And did you continue to feel that
25 there was some value, perhaps not as much, but

Page 132

1  some value left in Hamilton stock during some or
2  all of 2001?
3     MR. SALPETER:  Objection to form.
4     Q.  You can answer.
5     A.  Based on the financial statements
6  disseminated, I concluded and assumed that there
7  was some ongoing value, yes.
8     MS. SAXENA:  Okay.  Thank you.  I
9  have nothing further.
10    MR. SALPETER:  I have one further
11 question.
12
13         FURTHER EXAMINATION
14 BY MR. SALPETER:
15    Q.  Would you define one of the words
16 that you used, "hornswoggled"?  What does that
17 mean?
18    A.  It means that -- it's a word that my
19 father used to use.  You were trying to escape
20 and some party removed your pants.
21    Q.  In a way that was embarrassing?
22    A.  It could have been if you had looked
23 back.
24    MR. SALPETER:  I have no further
25 questions.

# EXHIBIT

# D

Page 1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF MIAMI
2
     MIAMI DIVISION
3
     CASE NO. 01-CIV-0156-GOLD/DUBE
4
5
6    IN RE:                )
                           )
7    HAMILTON BANCORP, INC., Securities  )
     Litigation,           )
8                          )
     - - - - - - - - - - - - - - - - - x
9
10
11
     DEPOSITION OF DR. JOHN ALBERS
12
13
14
15      Taken before Thomas R. Neumann,
16   Registered Reporter and Notary Public in and for
17   the State of Florida at Large, pursuant to notice
18   of taking deposition filed in the above cause.
19
20          - - -
21
22   1500 Miami Center
     Miami, Florida 33133
23   Tuesday, June 25, 2002
     10:20 a.m. - 4:00 p.m.
24
25

---

Page 2

1    APPEARANCES:
2    On behalf of Plaintiff, Dr. John Albers:
3       MILBERG WEISS BERSHAD HYNES &
        LERACH, LLP
4       5355 Town Center Road, Suite 900
        Boca Raton, Florida 33486
5       BY: MAYA SAXENA, ESQ.
6    On behalf of Defendant, Deloitte & Touche LLP:
7       MAYER, BROWN, ROWE & MAW
        190 South LaSalle Street
8       Chicago, Illinois 60603-3441
        BY: DANIEL J. DELANEY, ESQ.
9
     On behalf of Defendant Hamilton:
10
        GREENBERG TRAURIG, P.A.
11      1221 Brickell Avenue
        Miami, Florida 33131
12      BY: SUSANA BETANCOURT, ESQ.
13   On behalf of the Underwriter:
14      SKADDEN, ARPS, SLATE, MEAGHER &
        FLOM LLP
15      Four Times Square
        New York, New York 10036-6522
16      BY: PETER B. MORRISON, ESQ.
17
18
19
20
21
22
23
24
25

---

Page 3

1          - - -
2           I N D E X
3           - - -
   WITNESS       DIRECT CROSS REDIRECT RECROSS
4  DR. JOHN ALBERS
   By Mr. Delaney    4
5  By Ms. Betancourt       158        —
   By Ms. Saxena       170         -
6  By Mr. Delaney         175
7
8          E X H I B I T S
9          NUMBER     PAGE
           No. 1      49
10         No. 2      50
           No. 3      50
11         No. 4      52
           No. 5      80
12         No. 6      84
           No. 7      101
13         No. 8      107
           No. 9      113
14         No. 10     122
           No. 11     124
15         No. 12     127
16
17
18
19
20
21
22
23
24
25

---

Page 4

1          P R O C E E D I N G S
2    Thereupon,
3           DR. JOHN ALBERS
4    being by the undersigned Notary Public first duly
5    sworn, was examined and testified as follows:
6           DIRECT EXAMINATION
7    BY MR. DELANEY:
8       Q.  Good morning.  Could you state your
9    full name for the record, please.
10      A.  John E. Albers.
11      Q.  Good morning, Dr. Albers.  My name is
12   Daniel Delaney and I represent Deloitte & Touche
13   LLP in this matter.
14          Could you also state your home address
15   for the record, please.
16      A.  10068 Leacrest, L-E-A-C-R-E-S-T, road,
17   Cincinnati, Ohio 45215.
18      Q.  Do you have a separate business
19   address?
20      A.  No, just my home.
21      Q.  Are you retired?
22      A.  I'm retired as a cardiothoracic
23   surgeon.
24      Q.  How long have you been retired?
25      A.  Since 1993 from that position.

---

1 (Pages 1 to 4)

1 advice on which stocks to buy and sell?
2    A.   He generally does it on his own. I
3 find out about it when I get a confirmation
4 notice.
5    Q.   So Mr. Roth makes the decisions to buy
6 or sell for you?
7    A.   Yes.
8    Q.   And does he have discretion to buy and
9 sell any stock for you?
10    A.   Yes.
11    Q.   Is there any dollar limit on his
12 authority to buy and sell stocks for you?
13    A.   No.
14    Q.   I take it that he can't buy more stock
15 than you have the money to pay for?
16    A.   Well, that's right. Although there has
17 been a margin account, as you know.
18    Q.   But even the margin account had some
19 limit, I take it?
20    A.   Yes.
21    Q.   Do you know what the limit is on the
22 margin account?
23    A.   Well, the margin account has the limit
24 of whatever the SEC permits.
25    Q.   Can you tell me on an overall basis how

1 your investment holdings have done in the four
2 years since Mr. Roth has taken over this activity
3 for you?
4    A.   Well, currently one is down about 25%.
5    Q.   The one --
6    A.   The IRA. He owns two accounts for me,
7 my IRA and a personal account. The other one,
8 the personal account, is down about the same
9 amount.
10    Q.   The personal account is the margin
11 account?
12    A.   Yes.
13    Q.   Does Mr. Roth have this Carte Blanche
14 discretion to buy and sell stock for you for both
15 the margin account and for the IRA?
16    A.   Yes.
17    Q.   And the practice has been that Mr. Roth
18 doesn't call you before he buys the stock?
19    A.   That's right.
20    Q.   Does he call you after he buys the
21 stock and tell you what one he has bought?
22    A.   Generally not.
23    Q.   The only notice that you receive is the
24 trading confirmations?
25    A.   That's right.

1    Q.   Have you ever called Mr. Roth to tell
2 him that you disagreed with one of his decisions
3 to buy or sell a stock?
4    A.   Well, yes. A couple of times that I
5 remember.
6    Q.   What stocks were those?
7    A.   One happened to be Progressive
8 Insurance Company and I can't recall the other
9 one.
10    Q.   Those were the only two instances you
11 can recall where you called Mr. Roth and
12 expressed some unhappiness about a decision to
13 buy or sell?
14    A.   Some concern about it because of the
15 way the stock was going. Both times he reassured
16 me that it was going to be all right and it was.
17    Q.   As a result of these calls to Mr. Roth
18 did you make -- were any changes made in your
19 holdings of either of these stocks?
20    A.   No.
21    Q.   Other than your investment in Hamilton
22 Bank, can you tell me what other kinds of stock
23 investments you made in the last ten years?
24    A.   Well, there have been some other
25 insurance companies and some other banks, some

1 technology.
2    Q.   Enron?
3    A.   Those are primarily the ones, the
4 fields that he was investing in. Enron was one,
5 yes. I would like to forget that one.
6    Q.   Can you tell me some of the specific
7 names of the insurance companies that you have
8 invested in the last ten years?
9    A.   Yes. HCC, United Fire & Casualty,
10 Narra Bank Corporation, Silicon Valley, Redwood
11 Trust, Mercury General. PICO, of course, I had
12 some investment in, but he didn't have that. I
13 think that's as many as I can recall. There may
14 have been one or two more.
15    Q.   Other than the Hamilton Bank, can you
16 tell me the names of some other banking stocks
17 that you have invested in in the last ten years?
18    A.   I think Narra and Silicone Valley are
19 the only ones that I can recall right now and
20 Hamilton Bank, of course.
21    Q.   Can you tell me the name of any
22 technology stocks that you can recall investing
23 in in the last ten years?
24    A.   Yes. Microsoft, Oracle, Cisco, JDS,
25 Uniphase. Those are essentially it as far as I

Page 49

1    Q.   Any other kinds of government
2 securities?
3    A.   No.
4    Q.   When did you first hear about Hamilton
5 Bank?
6    A.   I heard about it from Mr. Roth.
7    Q.   Had you heard --
8    A.   I'm sorry, ask your question.
9    Q.   How did you first hear about Hamilton
10 Bank?
11    A.   When he purchased some shares of
12 Hamilton Bank.
13    Q.   When he purchased some shares for your
14 account in Hamilton Bank?
15    A.   Yes.
16    Q.   Did you hear about Hamilton Bank before
17 he purchased those shares?
18    A.   No.
19       MR. DELANEY:  Could we mark this as
20 Defendant's Exhibit 1.
21       (Defendant's Exhibit No. 1 was
22       marked for identification.)
23 BY MR. DELANEY:
24    Q.   Dr. Albers, the court reporter handed
25 you a document marked as Defendant's Exhibit 1.

Page 50

1 You can take a minute to look that over and let
2 me know when you had a chance to complete your
3 review.
4       (Pause.)
5       MR. DELANEY:  Mark this as Defendant's
6 Exhibit 2.
7       (Defendant's Exhibit No. 2 was
8       marked for identification.)
9       MR. DELANEY:  Mark this as Defendant's
10 Exhibit 3.
11       (Defendant's Exhibit No. 3 was
12       marked for identification.)
13       (Pause.)
14 BY MR. DELANEY:
15    Q.   Dr. Albers, the court reporter has also
16 handed you two documents which we have marked as
17 Defendant's Exhibit 2 and Defendant's Exhibit 3.
18 After you have had a chance to look at all three
19 of those, let me know. I just have a few
20 questions about all of them.
21    A.   I think I have looked at these.
22    Q.   First, taking a look at Defendant's
23 Exhibit 1, can you identify that for me?
24    A.   It's a Certification of Proposed Lead
25 Plaintiff Pursuant to Federal Securities Laws.

Page 51

1    Q.   Is this a document that you signed
2 February 12, 2001?
3    A.   Yes.
4    Q.   Was the information in this
5 certification complete and accurate as of the
6 date that you signed it?
7    A.   Yes.
8    Q.   And can you look at Defendant's Exhibit
9 2. Do you recognize that?
10    A.   Yes.
11    Q.   Can you tell me what that is?
12    A.   It shows my investments in Hamilton
13 Bancorp --
14    Q.   Is this for --
15    A.   -- and the trades and buys and sell
16 dates.
17    Q.   Is this for the margin account?
18    A.   This is for the margin account, yes.
19    Q.   Can you take a look at Defendant's
20 Exhibit 3 as well?
21    A.   This is the investment in Hamilton Bank
22 of the IRA.
23    Q.   All right.  Does Exhibit 2 reflect
24 accurately and completely all of the purchases
25 and sales that you made -- that were made for

Page 52

1 your margin account with Mr. Roth between July
2 13, 1999 and August 21, 2001?
3    A.   I would rather refer to my handwritten
4 notes there.
5    Q.   Okay.  We will mark these as
6 Defendant's Exhibit 4.
7       (Defendant's Exhibit No. 4 was
8       marked for identification.)
9       THE WITNESS:  This is accurate as to my
10 understanding of what I owned and the trades
11 made and the buys made.
12 BY MR. DELANEY:
13    Q.   You are referring to Defendant's
14 Exhibit 4 now?
15    A.   Yes.
16    Q.   Does Defendant's Exhibit 4 reflect the
17 purchases and sales of Hamilton stock in the IRA
18 account as well as the margin account?
19    A.   I believe this is just the margin
20 account.
21    Q.   Other than the purchases and trades
22 reflected on Defendant's Exhibit 4 for the margin
23 account, were there any other purchases or sales
24 that you made in Hamilton Bank stock.
25    A.   Purchases in the IRA?

Page 69

1  fact that they were mismanaged and he was
2  concerned why it wasn't picked up earlier and
3  particularly by the auditors.
4      Q.   Can you recall anything else?
5      A.   No, I don't think so.  We talked a
6  little bit about reserves because he knew I knew
7  something about reserves in reference to the
8  insurance business.
9      Q.   What did he tell you about reserves?
10     A.   He told me that they were under
11  reserves and they overstated their reserves and
12  that the loans they had made in Central America
13  were not reserved.
14         And he said, as I recall, something to
15  the effect that this should never have gotten by
16  the auditing division, that they didn't recognize
17  those loans were underreserved in Central
18  America.
19     Q.   This is a conversation you recall
20  occurring in November or December of 2000?
21     A.   Well, it was probably several
22  conversations after that time, particularly after
23  the first of the year.  He told me he was going
24  to try and sell out.
25     Q.   As best as you can, I would like you to

Page 70

1  focus on the first conversation with Mr. Roth
2  after the stock price dropped.  Limiting it to
3  that conversation, can you tell me what Mr. Roth
4  said?
5      A.   They were crooks.  That sums it up
6  pretty much.  He may have explained that more,
7  that they were crooks.
8      Q.   Can you recall anything more specific
9  that he said in this first conversation?
10     A.   They were crooks because they gave
11  misleading statements and being investigated by
12  the SEC and the OCC which was withheld -- it
13  wasn't withheld, but that there was some way that
14  they were saying it didn't amount to very much,
15  the investigation of the OCC and the SEC.  That's
16  about all I can recall.
17     Q.   Okay.  Can you recall anything that you
18  said to Mr. Roth during this first conversation
19  after the stock price dropped?
20     A.   Well, I was shocked and wondered how it
21  could happen, that's about all I remember talking
22  at that particular time with him about it.
23     Q.   Did you have any discussions with
24  Mr. Roth about selling your stock in Hamilton
25  Bank at that time?

Page 71

1      A.   He told me he was going to try and
2  salvage what he could after he found out more
3  information.
4      Q.   Do you know whether he began selling
5  stock for you at Hamilton Bank?
6      A.   Yes.  He did start selling stock, but
7  it wasn't -- I don't know when he started selling
8  it.  It's on that sheet.
9      Q.   Yes.  According to Exhibits 2 and 3,
10  you first sold stock through the margin account
11  in March of 2000.  Do you see that?
12     A.   Yes.
13     Q.   This is before this conversation you
14  are talking about with Mr. Roth, though, right?
15     A.   March of what?
16     Q.   March of 2000.  If you take a look at
17  the exhibit there.  If you look at
18  Exhibit 2, there is a chart with a schedule
19  showing how much you bought and sold and when.
20     A.   Yes, March 2000 he sold 500 shares.
21     Q.   Right.  Then you purchased more and
22  then you sell in March of 2001 and August of
23  2001.  Do you see that?
24     A.   That's right.
25     Q.   I assume that the first sale in March

Page 72

1  of 2000 is before this conversation with Mr. Roth
2  that you have been talking about?
3      A.   Yes.
4      Q.   Do you know why Mr. Roth sold the stock
5  for you in March 2000?
6      A.   He may have wanted to raise some cash
7  to buy another stock.
8      Q.   And was that unusual for Mr. Roth to
9  sell a particular stock just to raise money to
10  buy another stock for you?
11     A.   Not unusual.
12     Q.   And then there is a sale of 5,000
13  shares, according to Defendant's Exhibit 2, on
14  March 23, 2001.  Do you see that?
15     A.   Yes.
16     Q.   Can you tell me how long before that,
17  this conversation with Mr. Roth that you have
18  been telling me about, occurred?
19     A.   Well, as I stated, the first
20  conversation was either November or December of
21  2000.
22     Q.   Was a decision made at that point to
23  sell Hamilton Bank stock for you?
24     A.   Not particularly at that point in time
25  because he felt that perhaps the company relying

18 (Pages 69 to 72)

Page 129

1  equity --
2      A.   That whole page is --
3      Q.   It goes on to the next page as well.
4  My question for you, Dr. Albers, though, is
5  whether the note and the financial statements on
6  stockholders' equity would be one of the notes
7  the financial statements that you would have been
8  interested in reading.
9      A.   I probably looked at it. I don't
10 remember what my opinion was at that time.
11     Q.   There is a chart with numbers in it in
12 the middle of the page.
13     A.   Yes.
14     Q.   The next paragraph begins by stating,
15 "As part of this examination process, the Office
16 of the Controller of Currency ('OCC') has
17 directed the bank, among other things, to take
18 $32 million transfer risk reserves related to the
19 Bank's exposure in Ecuador and 'mark to market'
20 certain assets based upon the OCC's
21 interpretation of regulatory accounting rules."
22 Do you see that?
23     A.   Yes.
24     Q.   I want to direct your attention to the
25 next sentence. "While the bank has taken the

Page 130

1  actions directed by the OCC for regulatory
2  reporting purposes only, it disagrees with the
3  OCC's interpretations of the regulatory
4  accounting rules."
5         When you saw that, did you understand
6  that there is a difference between regulatory
7  reporting purposes and GAAP accounting purposes?
8      A.   Yes.
9      Q.   After you reviewed this, did you have
10 any discussion with Mr. Roth about the fact that
11 there is some figures being reported for
12 regulatory reporting purposes only as it concerns
13 the reserves for Ecuador?
14     A.   I don't recall having a specific
15 conversation about that.
16     Q.   Do you remember any conversations with
17 Mr. Roth prior to the November 2000 time period
18 when we were looking at those letters about the
19 reserves taken by Hamilton for regulatory
20 reporting purposes only for Ecuador?
21     A.   I remember discussing something with
22 him to the effect that he understood, as I
23 understood, that the -- these were minor
24 disagreements with the OCC.
25     Q.   It's quantified as a $32 million

Page 131

1  additional reserve. Do you see that?
2      A.   Yes.
3      Q.   And for a company the size of Hamilton
4  did you consider $32 million in additional
5  reserves to be a minor matter?
6         MS. SAXENA: Object to the form.
7  BY MR. DELANEY:
8      Q.   I'm sorry?
9         MS. SAXENA: Go ahead.
10 BY MR. DELANEY:
11     Q.   You need me to repeat the question?
12     A.   No. I understand your question.
13        I don't consider $32 million in this
14 size of a company to be minor except that the
15 arguments that they were based on were supposed
16 to be minor disagreements and the bank thought
17 that they didn't have to do that transfer.
18 That's my interpretation of it.
19 BY MR. DELANEY:
20     Q.   Well, the sentence says that the bank
21 has taken the actions directed by the OCC for
22 regulatory reporting purposes only.
23     A.   Yes.
24     Q.   Did you understand that that meant that
25 they had taken $32 million in reserves for

Page 132

1  regulatory reporting purposes that they hadn't
2  taken for GAAP accounting purposes?
3         MS. SAXENA: Objection to the form.
4         THE WITNESS: Repeat your question.
5  I'm sorry to make you do that.
6         MR. DELANEY: That's okay.
7  BY MR. DELANEY:
8      Q.   Based on your experience as a member
9  and then the chairman of an audit committee for
10 an insurance company, when you read that Hamilton
11 Bank had taken actions directed by the OCC with
12 respect to a $32 million increase in reserves for
13 regulatory reporting purposes only, did you
14 understand then that there would be a difference
15 between what they were reporting for regulatory
16 purposes versus what they were reporting for GAAP
17 accounting purposes?
18     A.   Yes, I did understand that.
19     Q.   Once you reviewed these financial
20 statements in the annual report for Hamilton
21 Bancorp, did you seek any advice from any
22 professionals other than Mr. Roth about
23 Hamilton's performance or its prospects?
24     A.   No.
25     Q.   Can you recall having any discussions

# EXHIBIT

# E

Page 1

```
 1        UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF MIAMI
 2
               MIAMI DIVISION
 3
          CASE NO. 01-CIV-0156-GOLD/DUBE
 4
 5
 6    IN RE:                    )
                                )
 7    HAMILTON BANCORP, INC., Securities  )
      Litigation                )
 8                              )
      - - - - - - - - - - - - - - - - x
 9
10
11
      VIDEOTAPE DEPOSITION OF JAMES WINN
12
13
14
15        Taken before Thomas R. Neumann,
16    Registered Reporter and Notary Public in and for
17    the State of Florida at Large, pursuant to notice
18    of taking deposition filed in the above cause.
19
20            - - -
21
22    1500 Miami Center
      201 South Biscayne Boulevard
23    Miami, Florida 33133
      Tuesday, July 9, 2002
24    10:12 a.m. - 3:53 p.m.
25
```

Page 2

```
 1    APPEARANCES:
 2    On behalf of Plaintiff, James Winn:
 3        MILBERG WEISS BERSHAD HYNES &
          LERACH, LLP
 4        5355 Town Center Road, Suite 900
          Boca Raton, Florida 33486
 5        BY: MAYA SAXENA, ESQ.
 6    On behalf of Defendant, Deloitte & Touche LLP:
 7        MAYER, BROWN, ROWE & MAW
          190 South LaSalle Street
 8        Chicago, Illinois 60603-3441
          BY: DANIEL J. DELANEY, ESQ.
 9
10    On behalf of Defendant, Hamilton:
11        GREENBERG TRAURIG, P.A.
          1221 Brickell Avenue
12        Miami, Florida 33131
          BY: SUSANA BETANCOURT, ESQ.
13    On behalf of the Underwriter:
14        SKADDEN, ARPS, SLATE, MEAGHER &
          FLOM LLP
15        Four Times Square
          New York, New York 10036-6522
16        BY: PETER B. MORRISON, ESQ.
17    Also Present:
18        BRETT ROBBINS
          ACTION VIDEO
19
20
21
22
23
24
25
```

Page 3

```
 1              - - -
 2            I N D E X
 3    WITNESS         DIRECT CROSS REDIRECT RECROSS
 4    JAMES WINN
      By Mr. Delaney       4        --
 5    By Ms. Betancourt         193        --
 6
 7          E X H I B I T S
 8        NUMBER      PAGE
 9        No. 13     62
          No. 14     63
10        No. 15     65
          No. 16     94
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1         P R O C E E D I N G S
 2    Thereupon,
 3           JAMES WINN
 4    being by the undersigned Notary Public first duly
 5    sworn, was examined and testified as follows:
 6         DIRECT EXAMINATION
 7    BY MR. DELANEY:
 8      Q.   Good morning.  Could you state your
 9    full name for the record, please.
10      A.   James Richard Winn.
11      Q.   Mr. Winn, my name is Daniel Delaney and
12    I represent Deloitte & Touche in this matter.
13    Could you state your business address for the
14    record?
15      A.   I'm actually retired -- semi-retired,
16    but the address -- current address I have is 3200
17    Rockmart Road in Rockmart, Georgia.
18      Q.   Is that your home address?
19      A.   Yes.
20      Q.   What business are you retired from?
21      A.   Insurance sales.  I'm semi-retired.
22    I'm trying to get to where I'm retired.
23      Q.   How long were you in the insurance
24    sales business?
25      A.   About 40 years.
```

Page 17

1  investing in stocks?
2      A.   I'm going to guess probably 20 to 25
3  years. That's a guess.
4      Q.   How did you get started?
5      A.   Probably closer to 20.
6           A friend -- actually it was my
7  supervisor, chairman of the board of UICI.
8  Actually how did he get -- when I started buying
9  stock, they would withdraw from our weekly or
10  monthly checks an amount that we approved and
11  then they matched it dollar for dollar and they
12  bought stock with that. That's where I
13  originally started getting involved with stock.
14      Q.   Was that a 401(K) plan?
15      A.   No, it was not. I don't know what you
16  would call it. But we just -- the company I had
17  joined was UICI, which is traded over the New
18  York Stock Exchange, and we had the opportunity
19  to participate up to a percentage of our first
20  year earnings and our renewal earnings. I always
21  took the maximum and then they matched it dollar
22  for dollar. I did that for 15 years.
23      Q.   And did that fund invest in the
24  company's own stock?
25      A.   It did in the beginning and then we

Page 18

1  invested it at 10% a year of what they matched.
2           After ten years, which is what I
3  elected to do, then I pulled the money out -- not
4  all of it but most of it, and I gave it to
5  Charles Roth and asked him to diversify and
6  spread it out and that's what we did.
7      Q.   How long has Mr. Roth been doing that
8  for you?
9      A.   I'm going to guess 15 years.
10      Q.   Does Mr. Roth currently act as an
11  investment advisor for you?
12      A.   Yes.
13      Q.   Does he also act as a broker for you?
14      A.   Yes.
15      Q.   Do you use anyone else besides Mr. Roth
16  currently as an investment advisor?
17      A.   No.
18      Q.   Do you use anyone else besides Mr. Roth
19  as a broker currently?
20      A.   No.
21      Q.   During any of the time that you have
22  been using Mr. Roth for the last, say, 15 years,
23  has anyone else acted as your investment advisor
24  or broker?
25      A.   Yes. I don't know the name of the

Page 19

1  gentleman, but when this stock and the Symons &
2  Goran stock, they were fairly close when we lost
3  our money with Hamilton Bancorp and with Symons &
4  Goran. We lost a significant amount of money
5  there. I say we, my brother and I. He had
6  invested as well.
7           When that stock went down, he pulled
8  his money away from Charles Roth and put it with
9  a broker in Southern California. I don't know
10  the name. We were both very disappointed,
11  obviously.
12           I took everything I had and took it out
13  of Charles Roth and put it in with the same
14  broker my brother was using in a large bank in
15  California. I don't know the name of it.
16           They were there about three months and
17  then the fellow that we sat down with and met in
18  the bank was offered another opportunity
19  somewhere and left.
20           Then we didn't really -- we are not
21  very -- that comfortable with what we were doing,
22  so I don't know what Bob, my brother, has done
23  with his money. I took all the money back out
24  and sent it right back over to Charles. That all
25  happened within a three to six-month period.

Page 20

1      Q.   Other than this person in California,
2  have you used anyone else other than Mr. Roth?
3      A.   No.
4      Q.   How about before Mr. Roth, did you use
5  anyone else as an investment advisor?
6      A.   I was not involved in stock before
7  Mr. Roth other than the stock that I bought as I
8  mentioned to you earlier with the company.
9      Q.   Let me make sure I understand what you
10  are telling me about Mr. Roth and this person in
11  California. Do you remember the name of the
12  entity in California?
13      A.   I have no idea. I can get it,
14  obviously, it's in the records. I don't have it.
15  I can't tell you here today.
16      Q.   At the time that you pulled the
17  investments away from Mr. Roth, did you have
18  stock in Hamilton Bank?
19      A.   Yes. That was one of the reasons that
20  we pulled it away from him. At the time that I
21  had stock -- would you restate your question
22  again.
23      Q.   I'm asking about the time that you
24  pulled the investments away from Mr. Roth, at
25  that time, did you own stock in Hamilton Bancorp?

5 (Pages 17 to 20)

Page 29

1  was buying different things, a business or a real
2  estate building or something like that, I would
3  call him and tell him I needed X number of
4  dollars and he would sell the stock and then I
5  would invest it.
6      Q.   Has that been going on continuously
7  over the 15 years you have been investing with
8  Mr. Roth?
9      A.   I have pulled money out from there with
10 some regularity, I guess.  Probably more than I
11 should have, but now it turns out I'm kind of
12 glad I did with where we put it.
13          Not regularly.  Maybe five or six
14 times, I guess, I pulled out significant sums.
15     Q.   Other than the stock in UICI and the
16 stocks that you have bought through Mr. Roth,
17 have you bought any other stocks?
18     A.   I don't believe I have ever bought any
19 stock that didn't come through Charles Roth.  I
20 don't believe I have bought any.
21     Q.   Other than the UICI stock?
22     A.   Right.  Right.  If there is something
23 out there, I don't remember it.  But I don't --
24 it would be the exception, that's for sure.  But
25 I don't recall any.

Page 30

1      Q.   I'm going to go back to the first phone
2  call that you had with Mr. Roth after you met him
3  at that meeting in Dallas.
4          Did you and Mr. Roth discuss investment
5  goals?
6      A.   No.
7      Q.   Did you and Mr. Roth discuss investment
8  strategy?
9      A.   No.
10     Q.   Why don't you just tell me everything
11 you remember about that first phone call.
12     A.   I don't remember very much at all.  I
13 just said, Charles, I have some money I want to
14 send over to you and put it in the market and you
15 make the call because I know nothing about the
16 market.  So it's your call, it's totally
17 discretionary, it's your -- you don't have to
18 call me.  I would like to know.  About once a
19 month we should talk and tell me whether we are
20 doing good or bad.
21          That's pretty much the way we have done
22 it for years.  Once a month he will call me, we
23 will go through the area of what we have done
24 that month.
25     Q.   How soon after this first phone call

Page 31

1  with Mr. Roth did you then send him the first --
2      A.   I don't remember.  It was probably
3  rather soon, I would guess.  A week, two weeks
4  maybe.
5      Q.   One other rule I forgot to mention at
6  the beginning.  So the court reporter can take us
7  both down, we need to make sure we don't talk
8  over each other.
9      A.   I have to let you finish.
10     Q.   You have to let me finish my question
11 and I'll try not to start my next question until
12 you have had a chance to finish.
13     A.   I apologize.  I'm used to -- I'm not
14 used to this.
15     Q.   I understand.
16          My question was, how long after your
17 first -- after this first phone call with
18 Mr. Roth did you send him the UICI stock to begin
19 investing?
20     A.   I don't remember.  I would guess soon
21 thereafter.  I'm going to guess a week to two
22 weeks after I made the call then.  That was the
23 purpose of the call.  Then I went ahead and sent
24 him the money.
25     Q.   Did you sign any agreements with

Page 32

1  Mr. Roth?
2      A.   No.
3      Q.   There was no brokerage account
4  agreement or anything like that?
5      A.   Not that I can remember.  He may have
6  sent me something and I signed it and sent it
7  back.  I don't remember.  That's 15 years ago.
8  There may have been one.  I don't know.
9      Q.   And what did Mr. Roth do after he got
10 your stock in UICI?
11     A.   He bought stock.
12     Q.   Did he do it immediately?  Did he start
13 liquidating the UICI investment and start buying
14 other stocks?
15     A.   He didn't take the whole lump sum and
16 completely go out and buy everything the next
17 day.  I think it may have taken him six months
18 maybe.  The record would show.  I don't remember
19 as to when he purchased the stock.  I don't know.
20     Q.   You remember over the course of some
21 months --
22     A.   Yes.
23     Q.   -- Mr. Roth then started selling your
24 UICI stock and began investing in other stocks?
25     A.   Yes.

8 (Pages 29 to 32)

1  If you look at the history of the account, were
2  there losers? Yes. Not anything like these two.
3  These were by far the largest.
4      Q.   And it's these two, Hamilton and
5  Symons --
6      A.   Symons & Goran.
7      Q.   -- that you are a plaintiff in
8  litigation concerning?
9      A.   Yes, I am.
10     Q.   I think you told me before that it was
11 totally discretionary for Mr. Roth as far as what
12 stocks he would buy for you?
13   . A.   That's correct.
14     Q.   Was it also totally discretionary for
15 Mr. Roth as to when and which stocks he would
16 sell for you?
17     A.   Yes.
18     Q.   Did Mr. Roth call you before he would
19 buy a stock and tell you anything about it?
20     A.   Almost never. I can't remember once
21 that he did. I would get a purchase or a
22 statement that showed where he bought or sold X
23 number of shares of stock. I would look at it
24 and throw it in the trash.
25         We would shred it because it had a

1  Social Security number on it so we just shred it
2  and threw it away because I got the same
3  information on monthly statements. I didn't need
4  them. I would look at them and shred them and
5  throw them away. I would get those from him on
6  every sale or every purchase.
7      Q.   How soon after the trades occurred did
8  you receive these confirmations?
9      A.   I think like a day or two. I don't
10 remember looking at the date. I just assume he
11 had just bought them because I would get them
12 every time. So maybe a year -- I'm sorry, maybe
13 a day, maybe two days.
14     Q.   You mentioned before that your
15 brother -- is it Robert Winn?
16     A.   Yes.
17     Q.   He was also a client of Mr. Roth's?
18     A.   Yes.
19     Q.   Did you introduce your brother to
20 Mr. Roth?
21     A.   I probably did. If I didn't, Ron
22 Jenson would have.
23     Q.   Is your brother also in the insurance
24 business?
25     A.   He and I worked together in there for

1  years, yes.
2      Q.   Does your brother also -- did your
3  brother also own Hamilton Bank stock?
4      A.   I don't know. I know he owned one of
5  them. I'm not sure if he owned Hamilton or not.
6  He may not have. I know he did Symons & Goran
7  because he lost about the same amount I did on
8  that Symons & Goran.
9      Q.   Is he also a plaintiff in the Symons
10 case?
11     A.   Yes, he is.
12     Q.   But you don't know whether your brother
13 ever owned Hamilton stock?
14     A.   I don't know. I don't know.
15     Q.   Do you know why Mr. Roth would put you
16 into a stock that he wasn't putting your brother
17 into?
18     A.   He may have had more money to work with
19 on my account than he did Bob's.
20     Q.   Any other reasons that you can think
21 of?
22     A.   None that I know of.
23     Q.   Do you know if Ron Jenson ever invested
24 in Hamilton stock?
25     A.   I have no idea.

1      Q.   You never talked to him about it?
2      A.   No.
3      Q.   Do you know if Mr. Jenson still uses
4  Mr. Roth as an investment advisor?
5      A.   Yes, he does.
6      Q.   How often in, say, the last five years
7  have you talked with Mr. Roth about your
8  investments?
9      A.   We talk weekly or maybe two and three
10 times a week. Maybe daily. But we will go
11 through the entire portfolio once a month. When
12 the end of the month statement comes out, he
13 sends it to me, then he will call me. We start
14 right at the top and he will go through every
15 transaction.
16     Q.   And what do you discuss with respect to
17 those transactions?
18     A.   He will tell me why we sold or why we
19 bought.
20     Q.   Anything else that you discussed during
21 these monthly calls?
22     A.   It could be any number of things but
23 not anything -- I mean, it could be about another
24 company or another person that he and I know over
25 the years. We got to know a lot of the same

**Page 57**

1  Q.  Are you active in the management of
2  that business?
3  A.  I'm active in it, yes. I'm trying to
4  stay arm's length with it and let other people
5  run it. I'm trying to do that with all my
6  activities now.
7  Q.  Are you anything other than a passive
8  investor in all of these other businesses?
9  A.  No, I'm active in all of them. Again,
10  I'm trying to limit it as much as possible.
11  Q.  Do you serve on the boards of directors
12  of any of these businesses?
13  A.  Of these businesses? I'd be the
14  president on two of them.
15  Q.  Which two are you the president of?
16  A.  I knew you were going to ask me that.
17  We have just changed, made some changes.
18  College Fund Division, CFD. I'm the
19  sole owner of that. And the electrical, I'm a
20  33% owner in that. Those are the two.
21  Q.  You serve on the boards of those?
22  A.  Yes.
23  Q.  Any other boards that you served on?
24  A.  I'm on the board of the Haralson County
25  Chamber of Commerce.

**Page 58**

1  Q.  How do you spell Harrison?
2  A.  Haralson, H-A-R-A-L-S-O-N. It's in
3  Georgia.
4  Q.  Do any of boards that you serve on have
5  an audit committee?
6  A.  No.
7  Q.  During your service on any of these
8  boards have you reviewed auditors' reports on
9  financial statements?
10  A.  I have a fellow by the name of Gary
11  Friedman that does all of that. He is very well
12  experienced in that. He has been involved with
13  me for 20 years. He does all of that. I do none
14  of that.
15  Q.  You don't review financial statements
16  yourself?
17  A.  No. I will talk with Gary and he will
18  tell me if we have areas that need attention or
19  don't. But I don't sit down and look at the
20  statements.
21  Q.  How did you first hear about Hamilton
22  Bank?
23  A.  Charles Roth.
24  Q.  Did Mr. Roth tell you anything about
25  Hamilton Bank before you bought stock in it?

**Page 59**

1  A.  I think when he bought it, and I'm sure
2  we had a conversation either in our monthly when
3  we are discussing our account or when I got the
4  notice that he purchased 5,000 shares or whatever
5  he bought, then he probably -- if I was talking
6  to him that day or the next, he would say, you
7  are going to get a notice I just -- we just went
8  into Hamilton Bank or whatever and so, yes, I'm
9  sure we had that conversation.
10  I do know we had some conversations and
11  he said that it looked very good. I remember
12  that because -- if you will look, I think you
13  will see where we were buying with some
14  regularity and getting involved in it pretty
15  heavily, obviously, we did. So I know we had had
16  that conversation.
17  Q.  Do you recall anything else that
18  Mr. Roth told you about Hamilton Bank when you
19  first bought it?
20  A.  It looked good. The earnings look good
21  and things of that nature. That's why we kept
22  talking and I kept saying, well, let's just buy
23  more, let's just buy more.
24  He didn't rely on me to tell him that.
25  He may have bought more anyway and told me he

**Page 60**

1  already did. So he never called to get clearance
2  or whether he should buy more or not of anything.
3  But I would encourage him on something
4  that he felt really good about and say, well,
5  let's get into it heavy.
6  Q.  Can you recall anything else that
7  Mr. Roth told you specifically about Hamilton
8  Bank when you first bought it?
9  A.  When I first bought it?
10  Q.  Yes.
11  A.  Probably gave me -- not specifically,
12  no.
13  Q.  Did Mr. Roth tell you that he knew
14  anything about the management of Hamilton Bank?
15  A.  I don't remember. He may have. I
16  don't remember.
17  Q.  Did Mr. Roth tell you that he had met
18  anyone from Hamilton Bank when he first bought
19  stock in Hamilton Bank?
20  A.  He normally knows people that are
21  involved in just most of these. All of them, I
22  don't know. Probably not.
23  But he normally knows the people that
24  are involved somewhere in these companies we're
25  involved in or he knows the history or something

Page 129

1   he just got into the conversation here with him
2   on a teleconference call.  So he -- it's possible
3   that it didn't.  It might have been after this.
4   I don't know.
5       Q.   If you look back on your schedule of
6   stock purchases and sales that's reflected in
7   Defendant's Exhibit 14 and Defendant's Exhibit
8   13, do you see that there is a purchase of 5,000
9   shares of Hamilton Bancorp stock recorded for you
10  on November 8, 2000?
11      A.   November the 8th of 2000, yes, I have
12  that.
13  .   Q.   You see that?
14      A.   Yes.
15      Q.   Do you see that?
16      A.   Yes, I do.
17      Q.   Were you concerned that two days after
18  buying additional 5,000 shares in Hamilton Bank
19  stock that Mr. Roth is writing to the chairman of
20  Hamilton Bank that the Hamilton Bank shareholders
21  are in a perilous situation?
22      A.   The first part of your question again.
23      Q.   Were you concerned when you found out
24  that you had bought 5,000 shares of Hamilton Bank
25  stock on November 8th, two days before Mr. Roth

Page 130

1   writes to Mr. Masferrer and tells him that the
2   Hamilton shareholders are in a perilous
3   situation?
4       MS. SAXENA:  Object to the form.
5       THE WITNESS:  I wasn't concerned
6   because I didn't know he bought the stock on
7   that day and if he was buying it, I wouldn't
8   question it because he might have been trying
9   to average it up and had a reason to do that
10  and I wouldn't have questioned that.
11  BY MR. DELANEY:
12      Q.   You wouldn't have been concerned that
13  he is -- that Mr. Roth is writing the
14  shareholders are in a perilous situation within
15  two days of buying 5,000 more shares for you?
16      A.   It wouldn't matter because I had the
17  confidence in Charles that if he had a reason to
18  do it, I wouldn't question that.  He may have
19  thought -- he may have heard something, known
20  something, thought we could buy it at whatever
21  number, I don't know, an average and cut some of
22  our losses.
23      As I testified, I don't get into that.
24  He made the calls and I didn't even -- I wasn't
25  even worried about the 5,000.

Page 131

1       Q.   By the time you received a copy of this
2   letter from Mr. Roth, Mr. Roth had he told you
3   that he thought there were some fictitious
4   numbers in Hamilton Bancorp?
5       A.   I don't remember the date when he told
6   me.
7       Q.   Was it by the time you received a copy
8   of this letter?
9       MS. SAXENA:  Objection to the form.
10      THE WITNESS:  I just said, I don't know
11  when he told me.  I don't know if it was
12  before or after.
13  BY MR. DELANEY:
14      Q.   If you look at the schedule on
15  Defendant's Exhibit 14, in addition to the 5,000
16  shares that were purchased, November 8, 2000, do
17  you see that there is another 5,000 shares that
18  you buy of Hamilton stock on May 2nd of 2001 and
19  another 5,000 shares bought on May 22nd on 2001
20  and another 5,000 shares bought June 5th of 2001
21  and then over between June 11, 2001 and August
22  17th of 2001, it looks like another 20,000
23  shares.
24      A.   Yes.
25      Q.   I'm sorry, 15,000 shares.  Do you see

Page 132

1   that?
2       A.   How many shares?
3       Q.   15,000 between June 11 and --
4       A.   Yes, you are right.  Do I see it?  Yes,
5   I do.
6       Q.   Were you concerned at the time that
7   Mr. Roth was buying these additional shares of
8   Hamilton Bank stock in 2001 after you had
9   received a copy of his November 10, 2000 letter
10  saying that the shareholders of Hamilton were in
11  a perilous situation?
12      MS. SAXENA:  Object to the form.
13      THE WITNESS:  I have already testified
14  that I don't know -- I don't know when he'
15  buys the stock, how much he buys and why he
16  buys it.  He buys it and he has total -- I
17  don't know when he buys it.
18      If he does buy it, I wouldn't question
19  it.  Even if I had the letter in front of me,
20  I wouldn't question it.
21  BY MR. DELANEY:
22      Q.   I think you told me before that you do
23  receive the confirmations of the trades within a
24  few days?
25      A.   Yes, uh-huh.

Page 149

1    Q.   Okay. Did you have any discussions
2 with Mr. Roth about the increased regulatory
3 scrutiny and oversight that he says in this
4 letter Hamilton Bank was under?
5        MS. SAXENA: Objection to form.
6        THE WITNESS: I think he told me that
7 the OCC --
8        MR. DELANEY: Hold on. What's the
9 basis for the objection to the form?
10       MS. SAXENA: Asked and answered several
11 different times.
12       MR. DELANEY: I don't think so. Go
13 ahead.
14       THE WITNESS: I was thinking the same
15 thing. It seems like you are asking the same
16 thing over and over. I'm sure you have
17 another point you are trying to get to. It's
18 all right unless she tells me not to answer.
19       MS. SAXENA: You can go ahead and
20 answer.
21       THE WITNESS: No, I say unless she --
22 but it seems like I'm repeating myself over
23 and over and over because I have told you
24 that I get once a month -- sit down with him
25 and discuss it.

Page 150

1        And I don't go into details with any of
2 this. If we talk about it, it's in general
3 and I've testified to that I think four or
4 five times. I'll keep doing it if you want.
5        But the answer is, I don't get into
6 details with him. He does it and makes all
7 the calls. He has total discretion of the
8 accounts.
9        I don't want to know a whole lot about
10 it. If I did, it would affect my job and my
11 earnings. That's why I pay him pretty good
12 money to do what he does.
13 BY MR. DELANEY:
14   Q.   I understand that. You have told me
15 that before. But my question is more specific.
16 I'm focusing on the letter. And you received a
17 copy of this letter, right?
18   A.   Uh-huh.
19   Q.   And Mr. Roth writes in this letter that
20 Hamilton Bank is under increased regulatory
21 scrutiny and oversight. What I'm trying to find
22 out from you is can you tell me anything about
23 any conversations you had with Mr. Roth where he
24 told you that Hamilton Bank was under increased
25 regulatory scrutiny and oversight?

Page 151

1    A.   It seems like he told me that the OCC
2 was involved and that they either could or did or
3 will get a cease and desist. It could be very
4 serious.
5        And he said, I'm just watching it as we
6 go or something like that. He is trying to
7 stay -- I'm trying to stay on top of it and I'll
8 keep you tuned in. That's all it was. Something
9 like that was said.
10       But he -- I think the word he used
11 was -- I think I mentioned this earlier, that he
12 had never been hornswoggled this bad in 40 years
13 is what he had been -- the way he had been misled
14 with the information that he was given and with
15 this one and I think he was talking about it also
16 included the Symons & Goran problem which is
17 similar to this.
18       Again, it was fictitious information
19 given by the accounting firms that they approved.
20 Not given by them, but that they endorsed.
21       You'll have to get that from Charlie.
22 I don't know. You are taking me back two or
23 three years. That's the best I can recall of our
24 conversations. I don't have it totally accurate.
25   Q.   Did you and Mr. Roth decide to take any

Page 152

1 actions as a result of the increased regulatory
2 scrutiny and oversight that Mr. Roth wrote the
3 bank was under?
4    A.   I told him in one conversation that
5 there is nothing different about what's happened
6 to us than plain stealing money. I have a
7 problem with that. I just do.
8        And I felt like someone had just
9 literally went in and stole the money from me and
10 I said, I don't know what avenues we have that's
11 available to us. But I said, I want you to look
12 at what our best approach is because at least I
13 want to give it our best shot to try to recover
14 some of the money that they stole and that was
15 the words I used, I believe.
16       He said -- I said, I need you to help
17 me find out the best avenue. Then I have
18 testified to where we went from there.
19   Q.   Was this conversation with Mr. Roth
20 about the time of this letter?
21   A.   I don't know.
22   Q.   Do you know whether it was before or
23 after this letter?
24   A.   I don't know. I have already said
25 that.

Page 165

BY MR. DELANEY:
1  Q. And then there is a reference --
3  Mr. Roth again refers to the perilous financial
4  condition of the company?
5  A. Yes.
6  Q. I'm sorry. Did you say that you did
7  receive a copy of this letter?
8  A. No. I said I don't remember. I don't
9  think I did, but I may have.
10  Q. Okay.
11  A. I don't know.
12  Q. Can you recall any discussions that you
13  had with Mr. Roth between the time that you
14  received a copy of the November 10, 2000 letter
15  and the time that he sold your stock in Hamilton
16  Bank in August, September and October about
17  anything that had changed at Hamilton Bank?
18  A. Did I have any conversations about
19  anything that changed?
20  Q. Yes. Between the time of the November
21  10th letter.
22  A. I probably did. I mean, we were --
23  obviously, this was on the radar screen pretty
24  heavy. About every time we talked during this
25  time period, somewhere in here when this was all

Page 166

1  going down we talked quite a bit about it, but
2  what we talked -- I don't remember the
3  conversation in any one specific or I couldn't
4  tell you did we talk about these letters. We may
5  have. I don't know.
6  Q. Well, Defendant's Exhibit 14 shows that
7  in May, June and July of 2001 you are buying
8  Hamilton Bancorp stock. In fact, you buy 30,000
9  shares in May, June and July of 2001.
10  A. Uh-huh.
11  Q. And over the next three months, August
12  September and October, you sell all of the
13  Hamilton Bank stock. Do you see that?
14  A. Uh-huh.
15  Q. Can you tell me what changed? Why did
16  you go from in those months from buying the stock
17  to the very next month to selling all the stock?
18  A. Charlie could tell you. I don't know.
19  Q. Do you think you are a little unusual
20  of Hamilton Bancorp shareholders in that you
21  don't know the reasons that you bought and sold
22  the stock?
23  MS. SAXENA: Objection to the form.
24  THE WITNESS: I do very well in my
25  profession and I don't spend a lot of time

Page 167

1  shuffling papers. I make a lot of money.
2  And I have people that know -- are very well
3  at what they do in the stock market and I pay
4  them very good to do that.
5  I don't have time -- if I did that, my
6  job would suffer severely. I would not be
7  successful and I wouldn't make the money I
8  make. I have made seven figures for a few
9  years and I don't take the time to sit down
10  and go through stacks of paper. I mentioned
11  that earlier.
12  BY MR. DELANEY:
13  Q. Did you think you are like most other
14  Hamilton shareholders in doing that or do you
15  think you are unusual?
16  MS. SAXENA: Objection to the form.
17  THE WITNESS: Am I like -- I don't know
18  what the smaller shareholders or larger, I
19  don't know. I know there isn't anyone that
20  it disturbs more than it does me, the way we
21  have been abused.
22  Now, does that disturb the other
23  shareholders that way, I'm sure it does. But
24  I think I'm in good hands. The record proves
25  that I have done very well with the stock

Page 168

1  market the way I have handled it. I don't
2  know why I would want to change now.
3  I put trust in him and confidence in
4  him and he has done very well for me. We
5  have been hoodwinked by two companies and you
6  are one of them, your company. That hurt.
7  It hurt a lot. It hurt my family and hurt my
8  grandchildren. I don't like that. So what
9  else is there?
10  BY MR. DELANEY:
11  Q. That's not really responsive to my
12  question. My question was, it appears that you
13  went from buying 30,000 shares in May, June and
14  July of 2001 to selling them beginning the next
15  month, selling all of your stock.
16  A. I answered your question. I said no, I
17  don't know.
18  Q. Right. And my question is, do you
19  think that makes you unusual?
20  A. No. I may be unusual. I may be like
21  you. We are probably a little more successful
22  than the average run-of-the-mill, I'm sure. And
23  you probably work different than a lot of people
24  that are down here that are making a lot less
25  money than you do.

42 (Pages 165 to 168)

## HAMILTON BANCORP

| omments | Date | Number of Shares | Cost Per Share | Cost of Shares Purchased | Proceeds of Sales |
|---|---|---|---|---|---|
| | 09/29/2000 | 5,000 | $16.6900 | $84,078.00 | |
| | 10/09/2000 | 5,000 | 15.9375 | $85,315.50 | |
| | 11/08/2000 | 5,000 | 10.625 | $50,784.25 | |
| | 05/02/2001 | 5,000 | 7.0468 | $35,393.25 | |
| | 05/22/2001 | 5,000 | 9.26 | $46,615.50 | |
| | 06/05/2001 | 5,000 | 7.08 | $35,715.50 | |
| | 06/11/2001 | 5,000 | 6.26 | $31,615.50 | |
| | 07/19/2001 | 1,300 | 7.12 | $9,340.25 | |
| | 07/20/2001 | 3,700 | 7.12 | $26,578.25 | |
| | 08/17/2001 | 5,000 | 6.012 | $30,313.00 | |
| | 08/22/2001 | (8,100) | 3.3123 | | $26,570.73 |
| | 08/23/2001 | (1,100) | 3.7182 | | $4,036.88 |
| | 09/05/2001 | (1,000) | 3.05 | | $2,996.89 |
| | 09/06/2001 | (13,000) | 3.2308 | | $41,589.74 |
| | 09/10/2001 | (1,000) | 3.04 | | $2,986.89 |
| | 09/11/2001 | (4,000) | 3.04 | | $12,031.59 |
| | 09/12/2001 | (5,000) | 3.1 | | $15,340.23 |
| | 09/27/2001 | (1,800) | 3 | | $5,340.57 |
| | 09/28/2001 | (2,500) | 3.05 | | $7,543.62 |
| | 10/01/2001 | (1,000) | 3.14 | | $3,086.89 |
| | 10/03/2001 | (1,500) | 3.02 | | $4,448.71 |
| | 10/05/2001 | (2,000) | 3 | | $5,934.30 |
| | 10/10/2001 | (3,000) | 3 | | $8,902.95 |
| TOTALS | | 0 | | $435,749.00 | $140,809.99 |

AVG COST PER SHARE

($140,809.99)
$294,939.01

EXHIBIT
1 4
7/9/02

Jim Wixir - Mirgir

**CONFIDENTIAL**

000001

# EXHIBIT

# F

## Montag & Joselson

Members of New York Stock Exchange

2401 East Second Avenue - #225
Denver Colorado 80206-4716

croth10380@aol.com

Telephone
(303) 320-3669

Facsimile
(303) 322-7433

November 10, 2000

Mr. Eduardo A. Masferrer
Chairman of the Board
Hamilton Bancorporation
3750 N.W. 87th Avenue
Miami, Florida 33178

Dear Mr. Masferrer:

After the intemperate remarks in the last teleconference similar comments may
not be well received, but you and I have become inadvertently confined in something of a
shotgun marriage. During the past 15 months I have acquired about 300,000 shares of
Hamilton Bancorp at prices ranging from approximately $26.50 to $14.00. I am a
Denver based stockbroker and market maker in insurance stocks and an occasional buyer
of bank stocks. My unrealized loss is quite troublesome and I know of no fiduciary who
would not be uneasy, parked in this cul-de-sac as shareholders in a perilous situation with
virtually no hope for an early recovery. The faltering financial condition of your bank
effectively holds us hostage. Only you can provide the means of relief.

I was introduced to Hamilton Bancorp during a presentation by Carlos
Bernace at a Hoefer & Arnett conference. He was personally impressive, the bank's
unique franchise was appealing, and its performance record appeared to be exceptional.
Unfortunately I acquired the stock with the presumption that earnings projections would
be reasonably accurate. These forecasts were initially derailed in the third quarter of
1999, and the train was completely wrecked last week.

Until recently, I relied on professional sources, purportedly well informed who
confirmed your good reputation, asserted that the bank was operated efficiently (financial
statements seemed to support that conclusion), and further, that the management was
generally resourceful and honest. Regrettably, both your image and reputation in the
investment community are now severely tarnished. The last operating statement was no
mere speed bump. We both hope that the bank may eventually recover, but unless
extraordinary actions are initiated immediately the stock will continue to ossify. I have

000162

Mr. FJuardo A. M. sferrer
Page Two

been in this business a long time, and while I am in no position to judge either your competence or that of your management, this is no ordinary crisis and requires abrupt remedies. Your bank is under increased regulatory scrutiny and oversight, there is a growing reservoir of dissident shareholders publicly expressing less than salutary opinions on the company's direction, and recent disclosures of a laxity in underwriting and risk selection have eroded the stature Hamilton Bancorp once enjoyed. If you ignore the convergence of these alarming problems, they will inevitably worsen.

Simple logic would now suggest that the Board seriously consider the unsolicited advice of your most vocal critics. By all means engage industry consultants and/or investment bankers to determine Hamilton Bancorp's current market value, or its projected value if annualized earnings can be realistically projected to $2.00 per share or more. That many in the investment community no longer believe you is only part of the problem; more importantly they do not believe in you or your management staff. The strident criticisms during the teleconference had a certain compelling logic. Obviously, shareholder skepticism is so widespread that even if the bank makes a remarkable recovery there is little reason to believe that the market response will be commensurate. Shareholders, burned not once but twice will sell into any market advance in droves.

You once had a shareholder base which acquired your stock with the conviction that your company had high potential. Today that same group is corralled in a thin market with fragile bids and virtually no resistance to decline, the precursor of a growing malaise. By publicly announcing your Board is considering alternatives--a minimal strategy at best--it could ameliorate the ongoing pressure on your stock. Conversely, a docile acceptance of this status quo will exact costly penalties on us all.

Sincerely,

MONTAG & JOSELSON

Charles A. Roth

000163

# EXHIBIT

# G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| IN RE HAMILTON BANCORP, INC.<br>SECURITIES LITIGATION | Case No. 01-CIV-0156<br>Gold/Simonton |

# Expert Report of Frederick C. Dunbar

# I.   SCOPE OF THE ASSIGNMENT

I have been retained by counsel for Deloitte & Touche LLP ("Deloitte") in the Hamilton Bancorp, Inc ("Hamilton") Securities Litigation as an expert.  My curriculum vitae is attached as Exhibit 1.

In this case, Plaintiffs seek to represent a class that purchased Hamilton common stock during the period between April 21, 1998 and June 8, 2001. Plaintiffs allege that during the class period, Deloitte disseminated or approved statements "which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."[1]  Deloitte was Hamilton's auditor during the class period.  In this capacity, Deloitte issued opinions on Hamilton's year-end financial statements for 1998 and 1999.[2]

On December 22, 2000, Hamilton announced that it would restate its audited results for 1998 and 1999, as well its unaudited financial results for the first three quarters of 2000.  After the market closed on April 3, 2001, Hamilton announced that it expected to fall short of analysts' expectations for the fourth quarter of 1999 and that an ongoing review of its previously filed financial statements would delay the filing of its audited financial statements for the financial year 2000 and might lead to further restatements.[3]  These further restatements – of 1999 and 2000 results – were announced on May 16, 2001 and filed in an amended form 10K on June 8, 2001.  In the 2000 10K, Deloitte expressed its reservations about Hamilton's ability to continue as a going concern.

Plaintiffs allege that "at all relevant times, the market for Hamilton common stock was an efficient market...as a result, the market for Hamilton securities promptly digested current information with respect to Hamilton from all publicly-available sources and reflected such

---

[1]   Plaintiffs' Consolidated Amended Class Action Complaint, p. 143.

[2]   The audited 10K for 1998 was filed on March 31, 1999 while the audited form 10K for 1999 was filed on April 13, 2000.

[3]   The SEC requires that companies file a form 10K within 90 days of the end of their fiscal years.

- 2 -

information in Hamilton's stock price.  Under these circumstances all purchasers of Hamilton common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies."[4] This report argues that Plaintiffs are not entitled to the presumption that Hamilton stock traded in an efficient market, as that term is used by the Supreme Court in *Basic v. Levinson*.[5]

## II.   COMPENSATION

National Economic Research Associates ("NERA") is being compensated for its time at standard billing rates and for out-of-pocket expenses at cost. My hourly rate is $475. The hourly billing rates of other people working on this project range from $180 to $335.

## III.   MATERIALS REVIEWED

In performing our analysis and preparing this report, we reviewed materials cited in this report and the following materials:

- Plaintiffs' Consolidated Amended Class Action Complaint;

- Market efficiency studies and legal decisions cited below;

- Common stock closing prices, market indices, Institutional holdings, shares outstanding, and daily volume from FactSet Research Systems, Inc., December 1999 Compact D SEC and Bloomberg L.P.;

- Press releases issued by Hamilton;

- Shareholder lists for Hamilton common stock;

- Analyst reports covering Hamilton;

- Press coverage for Hamilton from news services including Dow Jones & Company, Business Wire, Bloomberg L.P. and various other sources; and

- SEC filings.

---

[4]   Plaintiffs' Consolidated Amended Class Action Complaint, pp. 133-134.

[5]   *Basic Incorporated, et al. v. Max L. Levinson, et al*, March 7, 1988 [1988 U.S. LEXIS 1197].

- 3 -

## IV. ECONOMIC CONCEPTS AND INDICATORS OF MARKET EFFICIENCY/ DEVELOPMENT

In an efficient market, prices adjust immediately and accurately to all publicly available information.[6] Patell and Wolfson find that information is often incorporated into a stock's price within ten minutes following an announcement.[7] Market development is generally a precondition for market efficiency in that developed markets have the economic machinery for rapid assimilation of news into stock price valuation by the market. Market efficiency represents the actual assimilation of news into stock price valuation by the market. The relevant market for this analysis is the market for a given stock.[8] Our analysis examines several factors that have been used by economists and courts in assessing market efficiency.[9] These include:

- volume of trading activity;

- institutional holdings of the stock;

- float of the stock;

- ability of the issuer to file an SEC Form S-3;

- eligibility requirements for SEC Form B; and

- stock price behavior reflecting the ability of the stock price to react quickly and accurately to firm-specific news. Specifically, we compare the number of significant stock price reactions on days with such news to those on days without.

---

[6]  Brealey and Myers, Principles of Corporate Finance, 6th edition, p. 358. Burton Malkiel, "Efficient Market Hypothesis," In the New Palgrave Finance, 1989. John Eatwell, Murray Milgate, Peter Newman. New York and London: W.W. Norton.

[7]  Patell and Wolfson,"The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements." Journal of Financial Economics, 13, 223-252, 1984.

[8]  In other words, the market for an individual stock may be inefficient, despite the fact that the stock trades on a relatively developed exchange. See for example O'Neil v Apel 165 F.R.D. 479 (United States District Court, W.D. Michigan, Southern Division., 1996) where the market for a Nasdaq small cap stock was found to be inefficient.

[9]  Cammer v. Bloom, 711 F. Supp 1264 at 1286 (D.N.J. 1989); Binder v. Gillespie, 184 F.3d 1059 (9th Circuit, 1999).

- 4 -

## V.   THE MARKET FOR HAMILTON STOCK WAS NOT WELL DEVELOPED

A developed market has the necessary volume of shares and the publicity for active market participants to obtain the information about the stock, purchase or sell the stock, and thus to enable news to be rapidly translated into the market price for a stock. The market for a stock is efficient when this rapid and accurate translation of news into market price occurs. Exhibit 2 summarizes market development factors for Hamilton.

### A.  Hamilton Was A Thinly-Traded Stock

When a stock is thinly traded, the market for it is less likely to be efficient. This is because it is harder for market participants to take a large trading position in the stock to take advantage of new information.  Consequently, the market may not rapidly and profitably translate news into a revised stock price, which, in turn, reduces the benefit to market participants from closely monitoring the stock. Indeed, one academic study examines a variety of factors related to market efficiency, and suggests that dollar volume is the most significant predictor of efficiency.[10]  A second academic study emphasizes the importance of trading volume and analyst coverage in differentiating between stocks trading in efficient markets and those stocks trading in inefficient markets.[11]

Hamilton's turnover of 0.93 percent, measured by the ratio of average weekly trading volume to shares outstanding, fails to meet the criterion set by an academic study for even a "substantial presumption" that the market for the stock is efficient.[12]  Also, the daily trading volume for Hamilton is substantially below that of other stocks in the New York Stock

---

[10]  V.L. Bernard, C. Botosan, and G.D. Phillips. "Challenges to the Efficient Market Hypothesis: Limits to the Applicability of Fraud-on the-Market Theory." 73 *Neb L. Rev.* 781 (1994).

[11]  B.M. Barber, P.A. Griffin, and B. Lev. "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency." 19 *Iowa J. Corp. L.* 285 (1994).

[12]  "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." A Bromberg and L. Lowenfels, Bromberg and Lowenfels on Securities Fraud & Commodities Fraud 2d ed p. 815. Turnover is calculated using an adjustment of 54.76 percent for dealer participation. See Fernando Avalos and Marcia Kramer Mayer, "Dealer Participation on the New York Stock Exchange and Nasdaq," *NERA Securities and Finance Insights,* May 2002.

Exchange ("NYSE"), the American Stock Exchange ("AMEX "), the Nasdaq Smallcap ("NDQ"), and the Nasdaq National Market System ("NMS"). Hamilton's average daily volume during the class period was 41,451 shares. Adjusting this figure to account for dealer participation results in an average daily volume of 18,752 shares.[13] This was only 5.8 percent of the average equivalent figure for stocks in the NYSE, AMEX, NDQ, and NMS of 323,890 shares per day. See Exhibit 2.

Furthermore, during the class period, Hamilton's average daily volume had a value of $378,169, using the period's average price. This is only 6 percent of the $6.3 million average value of daily volume for NYSE/AMEX/NDQ/NMS traded stocks.

## B. Hamilton's Float Was Small

The float of a stock represents the shares of a firm's stock that are held by the public rather than by insiders, and is calculated as shares outstanding minus insider holdings. A stock with a low float is more likely to be inefficiently priced both because of low liquidity and because the larger the holdings held by insiders with private information, the less likely the price of the stock accurately reflects all information about the security.

As a percentage of shares outstanding, Hamilton's float was 85.2 percent as compared to an average of 81.8 percent for other firms in the stock market. However two facts argue that to merely consider this headline figure is misleading when attempting to determine whether the market for Hamilton's shares was efficient. First, the value of Hamilton's float, at $165.4 million, was only 7.5 percent of the average float value for NYSE/AMEX/NDQ/NMS stocks. See Exhibit 2. Second, Hamilton had low volume despite its float showing that passive investors held a large amount of stock.

We have been asked to assume that a group of non-insider passive investors controlled 1.36 million shares or 13.45 percent of the shares outstanding. These shares did not trade during the class period. Adjusting the float to reflect that these shares were unavailable to other

---

[13] The dealer participation rate is 54.76 percent.

- 6 -

investors produces an effective float of 71.8 percent with a value of $139.3 million, reducing Hamilton's float relative to market averages. See Exhibit 3.

### C. Hamilton Was Often Ineligible To File A Form S-3

To meet the threshold requirement to file SEC Form S-3 an issuer must have a history of 12 months reporting under the Exchange Act and a float in excess of $75 million. In connection with its offering of the Hamilton Capital Trust I 9.75 percent Series A Capital Securities, Hamilton did file an S3 and two amendments to that form in December 1998. However, in the aftermath of the November 2, 2000 announcement of a third quarter loss, Hamilton's float decreased substantially. See Exhibit 4. On 48 percent of the trading days after November 2, 2000, the firm's float was below $75,000,000.[14]

### D. Hamilton Lacked The Float To File Form B

To meet the threshold requirements to file SEC Form B, a company must have either a float of $75 million and average daily trading volume in excess of 1 million shares or a float in excess of $250 million. Hamilton did not meet these eligibility requirements. Its average daily trading volume of 41,451 shares was approximately 4 percent of the required volume for a stock with a float of $75,000,000.[15] Furthermore, its float reached $250 million on only 11.6 percent of the trading days in the class period.

A recent academic paper has argued that the existing Form B standards are too low to capture adequately market efficiency characteristics of stocks and that the standards should be raised.[16] Because Hamilton did not meet the current standards, an implication of the authors' position is that the market for its stock is likely not sufficiently liquid to be efficient.

---

[14] Often well below - the float reached as low as $56,269,307 on December 21, 2000.  The average float between November 2, 2000 and June 8, 2001 was $76.2 million.

[15] Adjusting for dealer particpation, Hamilton's trading volume was 1.8 percent of the required volume for a stock with a float of $75 million.

[16] Randall S. Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting." Law and Contemporary Problems. Winter/Spring 2000; Vol. 63 Numbers 1&2, p. 106.

## VI.  HAMILTON'S STOCK PRICE EXHIBITS BEHAVIOR NOT CONSISTENT WITH MARKET EFFICIENCY

The preceding section discussed how the basic market machinery needed for relevant firm-specific news to be translated rapidly into price movements was weak for Hamilton stock. The stock lacked a significant trading volume and several of the measures of a large float. Because the market for Hamilton stock was not well-developed, one would not expect the linkage between news and significant price reactions to be strong.[17] This section describes an aspect of share price behavior that provides evidence that Hamilton stock traded in an inefficient market.

In an efficient market, one expects that significant price movements are the result of market participants translating new firm-specific information into a revised valuation of the stock price. During the class period, however, the number of days on which Hamilton stock posted a statistically significant price move in the absence of such information far exceeded those days on which such a movement resulted from news concerning Hamilton.  See Exhibit 5. We analyzed whether the proportion of significant price reactions differed depending on whether or not there had been firm-specific news disclosed. In fact, statistical testing reveals that, during the class period, one can not reject the hypothesis that a statistically significant change in the price of Hamilton's stock was as likely to occur on a day with no firm-specific news as on a day without.[18]

---

[17]  In fact, on at least two occasions on which negative news was disclosed, the stock price either failed to react or increased.  Immediately after the December 22, 2000 restatement announcement, the stock did not respond.  It then subsequently rose.  Immediately after the April 3, 2001 earnings shortfall announcement, the price of Hamilton's stock rose by a statistically significant amount.

[18]  The hypothesis tested was that the difference between the proportions of significant price reactions on days without news and days with news was zero.  We found that we could not reject this hypothesis at the 5 percent level for our statistically significant price reactions, whether we considered price reactions that were significant at the 10 percent or the 5 percent level.

- 8 -

## VII. CONCLUSIONS

On the basis of the above evidence, Hamilton's stock is not entitled to the presumption that it traded in an efficient market during the class period.

*Frederick C. Dunbar*
_____
Frederick C. Dunbar

July 26, 2002

# EXHIBIT

# 1

NATIONAL ECONOMIC
RESEARCH ASSOCIATES
1166 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: 212.345.3000 FAX: 212.345.4650



## Exhibit 1
# FREDERICK C. DUNBAR

## BUSINESS ADDRESS

NATIONAL ECONOMIC RESEARCH ASSOCIATES, INC.
1166 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
(212) 345-3000

## EDUCATION

TUFTS UNIVERSITY
Ph.D., Economics, 1971
M.A., Economics, 1969

REED COLLEGE
B.A., Mathematics and Economics, 1966

## PROFESSIONAL EXPERIENCE

NATIONAL ECONOMIC RESEARCH ASSOCIATES, INC.

| | |
|---|---|
| 1988- | *Senior Vice President.* Directs projects in the economics of antitrust and trade regulation, environment, finance, mass torts, securities and transportation. |
| 1995-1998 | *Management Committee.* |
| 1995- | *Head of Recruitment and Professional Development Committee.* |
| 1988- | *Board of Directors.* |
| 1987-1998 | *Head of Securities, Mass Torts and Transportation Practice.* |
| 1984-1988 | *Vice President.* |
| 1979-1983 | *Senior Consultant.* |

CHARLES RIVER ASSOCIATES, INC.—Boston, Massachusetts

| | |
|---|---|
| 1976-1979 | *Program Manager.* Responsible for research on economic policy; director of CRA's subsidiary, Econometric Appraisal Systems, Inc. |
| 1971-1976 | *Senior Research Associate.* |

NORTHEASTERN UNIVERSITY—Boston, Massachusetts

| | |
|---|---|
| 1969-1971 | *Instructor, Department of Economics.* Taught graduate courses in mathematical economics, econometrics, and statistics; taught undergraduate courses in macroeconomics, business cycles and growth, and advanced statistics. |

TUFTS UNIVERSITY—Medford, Massachusetts

| | |
|---|---|
| 1969 | *Instructor, Department of Economics.* Taught social control of industry. |

## HONORS AND PROFESSIONAL ACTIVITIES

Adjunct Professor, Columbia University School of Law, 2000

Adjunct Professor, Fordham University School of Law, 1995-1998

American Bar Association Section of Antitrust Law, Transportation Industry Committee, 1998-present

New York Mercantile Exchange Appeals Committee, 1998-present

New York Mercantile Exchange Arbitration Committee, 1991-present

National Futures Association, Arbitrator, 1987-present

Competitiveness Policy Council, Subcouncil on Capital Allocation, Member, 1994

Committee on International Trade, The Association of the Bar of the City of New York, 1993-1997

Kennedy Memorial Teaching Award, Tufts University

National Science Foundation Trainee, Tufts University, three-year grant

Reviewer for *Journal of Financial Management*, *Journal of Industrial Economics*, *Antitrust Bulletin*

American Economic Association

American Finance Association

American Bar Association, Industrial Organization Economist Associate

## INVITED AND REFEREED PUBLICATIONS (10 years)

with David Tabak, "Materiality and Magnitude: Event Studies in the Courtroom," NERA Working Paper #34 (1999). (Reprinted in *Litigation Services Handbook: The Role of the Financial Expert, Third Edition*, edited by Roman L. Weil, Michael J. Wagner and Peter B. Frank, John Wiley & Sons, Inc., 2001)

with Denise N. Martin, Vinita M. Juneja and Todd S. Foster, "Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions," *Stanford Journal of Law, Business & Finance* (1999).



Consulting Economists

with Others, "Do the Merits Matter? Insights Gained by Viewing the Shareholder Class Action as an Option" (1997).

with Others, *Estimating Future Claims: Case Studies from Mass Tort and Product Liability* (Wayne, PA: Andrews Publications, 1996).

with Others, "Antidumping Law: A Proposed Amendment to Consider Downstream Industry," *World Trade and Arbitration Materials* (November 1996) and *The Record of the Association of the Bar of the City of New York* (January/February 1997).

with Vinita M. Juneja, "Making Securities Class Actions More Responsive to the Modern Shareholder," *Securities Class Actions: Abuses and Remedies*, The National Legal Center for the Public Interest (1994).

## PUBLICLY AVAILABLE REPORTS AND SPEECHES (10 years)

"Forecasting Mass Tort and Product Liability Claims," *Viewpoint* (The Marsh & McLennan Companies Journal), Vol. XXXI, No. 1 (2002).

Presentation, "Use of Expert Witnesses on Economics/Damages," *Law & Economics, Seventh Circuit Bar Association and Judicial Conference* (2002).

Presentation, "Shareholder Class Actions After the Nasdaq Crash," Glasser Legalworks 20th Annual Federal Securities Institute Seminar (2002).

"Trends in Securities Litigation and the Impact of the PSLRA," *Class Actions & Derivative Suits*, American Bar Association Litigation Section, Vol. 9, No. 3 (1999).

Presentation, "Damages: Maximizing (or Minimizing) Awards Through Winning Techniques," *Directors and Officers Liability -- Risk Management and Insurance*, Insight Information Conference (1998).

Discussant, "How to Best Utilize Expert Witnesses," *Antitrust Litigation – Strategies for Success*, Practising Law Institute (1998).

with J.D. Zona, "Issues in Antitrust Economics Testimony After *Daubert*," Practising Law Institute Course Handbook *Antitrust Litigation: Strategies for Success* (1998).

Presentation, "Post-PSLRA Trends in Shareholder Class Actions," *Unintended Consequences of the Private Securities Litigation Reform Act of 1995*, The Information Exchange (TIX) Director's & Officer's Liability Seminar (1998).

Presentation, "The Private Securities Litigation Reform Act: Impact to Date...and What to Expect On the Horizon," *D&O Liability*, American Conference Institute (1998).



*Consulting Economists*

Presentation, "Class Action Track – When Is Trading by Corporate Insiders 'Suspicious'?," American Bar Association National Institute on Securities Litigation and Arbitration (1998).

with Drew A. Claxton, "Estimating Future Claims in the Early Stages of a Mass Tort," *Diet Drugs Litigation,* Andrews Publications (1998).

"The 1986 Amendments to The False Claims Act: Do They Help or Hurt the Public?" prepared on behalf of United Technologies, Inc. (1997).

Presentation, "Securities Litigation Reform–During the First Five Months of 1997," *D&O Liability – A Comprehensive Review of the Latest Exposures and Claims Handling Issues,* American Conference Institute (1997).

"Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?" (1996). (Reprinted in 2 Sec. Reform Act Litig. Rep. 205 (1996).)

with Denise N. Martin, "The Effect of the 1995 Reform Act on Damage Estimates and Settlements in Shareholder Class Actions: An Overview," *D&O Liability--Critical Legal and Insurance Issues,* American Conference Institute (1996).

with Vinita M. Juneja and Denise N. Martin, "Shareholder Litigation: Deterrent Value, Merits and Litigants' Options," *Auditor and Director & Officer Liability for Misstated Financial Statements,* conference sponsored by John M. Olin School of Business, Washington University, St. Louis, Missouri, (Washington University Working Paper BLE-95-07-a) (1995).

"Recent Trends III: What Explains Settlements in Shareholder Class Actions?" (1995).

with Paul J. Hinton, "Analysis of Shareholder Damages Claims and the Potential Impact of Legal Reforms," *Directors' & Officers' Liability and Insurance,* EuroForum, London, (1995). (Reprinted in *Viewpoint,* 1995.)

Discussant, *The Role of Infrastructure in Economic Development — a Policy Conference,* Institute of Government and Public Affairs, University of Illinois (1994).

"Estimating Future Asbestos Claims: Lessons from the National Gypsum Litigation," *The Asbestos Future Class Action and the Future of Mass Tort Litigation Seminar,* Andrews Communications (1993).

"Recent Trends II:  What Explains Settlements in Shareholder Class Actions?" (1993).

"In Securities Suits, Technology Lets Economists Crunch More Numbers," *New York Law Journal* (1993).



Consulting Economists

Presentation at "Securities Class Actions: How to Settle Them," seminar sponsored by Winthrop, Stimson, Putnam & Roberts, New York (1993).

"Recent Trends in Securities Class Action Suits," presented at 13th Annual Antitrust and Trade Regulation Seminar, National Economic Research Associates, Santa Fe, New Mexico (1992).

## TESTIMONY (four years)

Deposition Testimony, In the United States District Court for the Northern District of Illinois – Eastern Division in *Emerald Investments LP, et al. v. The Equitable Life Assurance Society of the United States, et al.*, 2002.

Deposition Testimony, In the United States District Court for the Southern District of New York, *In re Bennett Funding Group, Inc. Securities Litigation*, 2002.

Deposition Testimony, In the United States District Court for the Southern District of New York in *Richard A. Lippe, Archie R. Dykes and John J. Robbins, as Trustees for Keene Creditors Trust v. Bairnco Corporation, et al.*, 2002.

Deposition Testimony before the Superior Court of California In and For the County of Alameda in *Western MacArthur Company v. United States Fidelity & Guaranty Co., The St. Paul Companies, Inc. and Argonaut Insurance Company*, 2002.

Testimony and Deposition Testimony, In the United States District Court for the District of Delaware in *In re S.C. Johnson & Son, Inc. v. DowBrands, Inc. DowBrands, L.P., and The Dow Chemical Company, Inc.* 2001.

Deposition Testimony before the United States District Court for the Middle District of Tennessee - Nashville Division in *In re PhyCor Corporation Securities Litigation*, 2001.

Testimony and Deposition Testimony, In the United States Bankruptcy Court for the Eastern District of Louisiana, *In Re: The Babcock & Wilcox* Company, *et al.*, 2001.

Testimony and Deposition Testimony before the United States District Court for the Southern District of New York in *Santa Fe Natural Tobacco Co., Inc. v. Eliot Spitzer (Attorney General of the State of New York); Antonia Novello (Commissioner of Health of the State of New York); Arthur J. Roth (Commissioner of Taxation and Finance of the State of New York); and Teresa Mason (Sheriff of the City of New York)*, 2000-2001.

Deposition Testimony before the United States District Court for the Eastern District of New York, *In re: MTC Electronic Technologies Shareholder Litigation*, 2001.


Consulting Economists

Testimony and Deposition Testimony before the United States District Court for the Eastern District of New York in *Robert A. Falise, et al. v. The American Tobacco Company, et al.*, 2000-2001.

Testimony and Deposition Testimony before the United States Bankruptcy Court for the District of Connecticut, *In the Matter of DeGeorge Financial Corporation, DeGeorge Capital Corporation, and DeGeorge Home Alliance, Inc.*, 2000-2001.

Testimony before the State of New Jersey Casino Control Commission, *In the Matter of the Petition of Park Place Entertainment Corporation for Approval of a Proposed Acquisition of the Assets and Business of the Claridge Hotel and Casino, and Certain Other Relief*, 2000.

Deposition Testimony, In the United States Bankruptcy Court for the District of Delaware in *In Re: Reliance Securities Litigation*, 2000.

Deposition Testimony, In the Circuit Court of West Virginia, Ohio County in *Christa J. Blankenship and Mae Sibo v. Philip Morris Incorporated, et al.*, 2000.

Testimony before the United States Bankruptcy Court for the Southern District of Indiana in *In Re: A.G. Financial Service Center, Inc.*, 2000.

Deposition Testimony before the United States District Court for the Eastern District of Arkansas, Western Division in *Capital Properties, LLC, Gus Blass II, John Allison, Robert C. Conner and Hall McAdams v. Trans World Airlines, Inc.*, 1999.

Testimony and Deposition Testimony before the United States Bankruptcy Court for the Eastern District of Michigan Northern Division in *In re: Dow Corning Corporation*, 1999.

Testimony and Deposition Testimony in the United States District Court for the Northern District of Illinois – Eastern Division in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, et al.*, 1999.

Deposition Testimony before the United States District Court for the Eastern District of Pennsylvania in *Hewlett-Packard Company v. Computer Aid, Inc., et al.*, 1999.

Deposition Testimony before the United States District Court for the Southern District of Florida in *In re: John Alden Financial Corporation Securities Litigation*, 1998.

Deposition Testimony before the United States District Court for the Southern District of Florida, West Palm Beach Division in *In Re: Cascade International Securities Litigation*, 1998.

Deposition Testimony before the United States District Court for the District of New Jersey in *Anthony M. Weikel, et al. v. Tower Semiconductor Ltd., et al.*, 1998.



*Consulting Economists*

Deposition Testimony before the United States District Court for the Southern District of California in *Ronald L. Durkin v. Rodney B. Shields, et al.*, 1998.

Deposition Testimony before the United States District Court for the Southern District of New York, *In re: Kidder Peabody & Co., Inc. v. IAG International Acceptance Group N.V.*, 1998.

Deposition Testimony, In the District Court of the Virgin Islands - Division of St. Thomas and St. John in *Government Guarantee Fund of the Republic of Finland, Saastoppankkien Keskus-Osake-Pankki (Skopbank), 35 Acres Associates, 12 Acres Associates and Benefori Oy v. Hyatt Corporation*, 1998.

July 2002



*Consulting Economists*

# EXHIBIT

# 2

Exhibit 2
Hamilton Bancorp, Inc.
Comparison of Market Development Factors [1]

| Trading Market (1) | Number of Issuers (2) | Volume* Average Closing Price [2] (3) | Daily Trading Volume [2] (4) | Number of FY1 I/B/E/S Estimates (5) | Average Institutional Holdings as a % of Shares Outstanding (6) | Value of Float (7) | Float as a % of Shares Outstanding (8) |
|---|---|---|---|---|---|---|---|
| A. Exchange Stocks [3] | 5,720 | $ 6,276,997 | 323,890 | 4.3 | 31.4% | $ 2,197,371,076 | 81.8% |
| B. Hamilton | 1 | $ 378,169 | 18,752 | 2.0 [4] | 35.0% [5] | $ 165,366,240 [6] | 85.2% [6] |
| C. Hamilton as a % of Exchange Stocks   B/A | | 6.02% | 5.79% | 46.76% | 111.56% | 7.53% | 104.18% |

Notes and Sources:

[1] Data obtained from December 1999 Compact D SEC and FactSet Research Systems, Inc. Issuers included are those listed as "Active" on the April 1999 Compact D SEC, incorporated in the United States for which all data are available, and for which weekly turnover rate was less than 100% (i.e., excluding three observations which appear to contain erroneous data). The data on the December 1999 CD is as of November 30, 1999, which is approximately halfway through the alleged class period (588 days from the beginning and 556 days from the end).

[2] Average over the period from April 21, 1998 through June 8, 2001. All other data are as of November 30, 1999.

[3] Includes stocks traded on New York Stock Exchange ("NYSE"), the American Stock Exchange ("AMEX"), the Nasdaq National Market System ("NMS"), and the Nasdaq Smallcap ("NDQ").

[4] December 1999 Compact D SEC.

[5] As of November 30, 1999. Quarterly data obtained from CDA/Spectrum via Thompson Financial, prorated using daily trading volume.

[6] Float calculated as shares outstanding (from SEC filings) minus insider holdings (from SEC filings and Insider Trading Monitor). Shares outstanding prorated using daily trading volume.

# EXHIBIT

# 3

Preliminary & Unchecked, numbers for report.xls,exhibit 3,7/26/2002, ER                    Privileged & Confidential

**Exhibit 3**
**Hamilton Bancorp, Inc.**
**Float Adjusted for Passive Investors**

| | | Value of Float | Float as a % of Shares Outstanding |
|---|---|---|---|
| A. Exchange Stocks [1] | | $ 2,197,371,076 | 81.79% |
| B. Hamilton [2] | | $ 139,255,424 | 71.76% |
| C. Hamilton as a % of Exchange Stocks | B/A | 6.34% | 87.73% |
| D. Percentile | | 54.55% | 23.22% |

Notes and Sources:

[1] Data obtained from December 1999 Compact D SEC and FactSet Research Systems, Inc. Issuers included are those listed as "Active" on the April 1999 Compact D SEC, incorporated in the United States for which all data are available, and for which weekly turnover rate was less than 100% (i.e., excluding three observations which appear to contain erroneous data). The data on the December 1999 CD is as of November 30, 1999, which is approximately halfway through the alleged class period (588 days from the beginning and 556 days from the end).

[2] Hamilton's float is calculated as shares outstanding (from SEC filings) minus insider holdings (from SEC filings and Insider Trading Monitor) minus shares held by passive investors. Shares outstanding prorated using daily trading volume. Shares held by passive investors totaled 1,356,406.

# EXHIBIT

# 4



Privileged & Confidential

Preliminary & Unchecked, numbers for report.xls.exhibit 4,7/26/2002, ER

Exhibit 4
Hamilton Bancorp, Inc.
Value of Float, April 21, 1998 through June 8, 2001

Notes and Sources:
Float is calculated as shares outstanding  – insider holdings.

# EXHIBIT

# 5

Preliminary & Unchecked, exhibit 5 5a  and data.xls, 10/15/2002, JWB

Privileged & Confidential

**Exhibit 5 – Amended [1]**
**Hamilton Bancorp, Inc.**
**Days with News are More Likely to Have Significant Price Reactions**
**Than Days with No News**
**January 1, 1998 to June 30, 2001**

| | | Days with News [2] | | | Days with No News [2] | | | |
|---|---|---|---|---|---|---|---|---|
| | Total Number | Number with Significant Price Reaction | Percent of Significant Price Reactions | Total Number | Number with Significant Price Reaction | Percent of Significant Price Reactions | Difference between Percentages Significantly Different from 0? [3] |
| | (1) | (2) | (2)/(1) (3) | (4) | (5) | (5)/(4) (6) | (7) |
| 10% Significance Level [4] | 130 | 12 | 9.2% | 751 | 44 | 5.9% | No |
| 5% Significance Level [4] | 130 | 10 | 7.7% | 751 | 26 | 3.5% | No |

**Notes and Sources:**

Data were obtained from FactSet Research Systems, Inc.

[1] This exhibit has been revised since the version that accompanied the Dunbar Report of July 26, 2002.

[2] We have performed a Kolmogorov-Smirnov test to determine if the distributions of the days with news and days no news differ significantly from each other. Our results show that they do not. See Exhibit 5a.

[3] Calculated using the formula: [(3) - (6)] / SQRT[σ(3)²/(1) + σ(6)²/(4)]. Testing for significance at the 5% level.

[4] Significance determined using a market model run on returns of the Nasdaq Composite over the period from January 2, 1998 through June 29, 2001.

Preliminary & Unchecked, exhibit 5 5a  and data.xls,exhibit 5a10/15/2002, ER                    Privileged & Confidential

**Exhibit 5a**
**Hamilton Bancorp, Inc.**
**Kolmogorov-Smirnov Test of Equality of Distributions**
**Between News Days and Non-News Days**

|  | Largest Difference [1] | P-value for Hypothesis that CDF is Smaller |
|---|---|---|
| **Days with No News** | 0.0369 | 0.719 |
| **Days with News** | 0.0920 | 0.143 |
| **Combined Value** | 0.0920 | 0.285 |

**Notes and Sources:**

[1] This is the largest difference between the two cumulative distribution functions.  For example, 0.0369 is the greatest amount by which the cumulative distribution function of the Days with News exceeds the cumulative distribution function of the Days with No News.  Analogously, 0.092 is the greatest amount by which the cumulative distribution function of Days with No News exceeds that of Days with News.  The Combined Value is the absolute value of the largest difference between the two.